576 A.2d 793

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. CONRAD P. HEMPELE AND SHARON HEMPELE, DEFENDANTS–RESPONDENTS.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JAMES J. PASANEN, DEFENDANT–APPELLANT.

Argued February 14, 1990—Decided July 17, 1990.

184

186

*Boris Moczula* argued the cause for appellant and respondent State of New Jersey (*Robert J. Del Tufo*, Attorney General of New Jersey, attorney).

*Edward V. Gannon* argued the cause for appellant James J. Pasanen (*Gannon, Murphy & Schwartz,* attorneys).

*Arthur J. Russo* argued the cause for respondent Sharon Hempele.

*Ernest F. Duh* argued the cause for respondent Conrad P. Hempele.

The opinion of the Court was delivered by

CLIFFORD, J.

The issue in these appeals, argued together, is the constitutionality of warrantless seizures and searches of garbage bags left on the curb for collection.

In *State v. Hempele* the trial court suppressed evidence seized under a warrant obtained after the warrantless seizure and search of defendants' garbage. In *State v. Pasanen* the trial court denied defendant's motion to suppress evidence obtained under similar circumstances. The Appellate Division affirmed both the suppression order in *Hempele* and the order denying suppression in *Pasanen.* We affirm the Appellate Division judgment in *Hempele* and reverse in *Pasanen.*

I

–A–

In *State v. Hempele* a confidential source informed the state police that defendants, Conrad D. Hempele and Sharon Hempele, were distributing illicit drugs from their home at 303 Mill Street in Belvidere. The informant claimed to have seen fifty pounds of marijuana in Conrad's bedroom.

On the basis of that information, a trooper seized the trash sitting in front of 303 Mill Street six months later. 303 Mill Street is one of about ten attached row houses, each with its own front entrance. A short stairway runs from each row house to an eight-foot-wide sidewalk abutting the street. The seized trash was next to the flight of stairs leading to 303 Mill

Street. Two weeks later the trooper again seized the garbage in front of the Hempeles' home. On both occasions the trooper removed white plastic trash bags from a plastic garbage can and took the bags to the State Police Tri–Man Unit, where, without a warrant, he opened them and analyzed their contents. He discovered traces of marijuana, cocaine, and methamphetamine in the trash.

A search warrant for defendants' home issued on the basis of the informant's tip and the evidence found in the garbage. When the subsequent search turned up controlled substances and drug paraphernalia, the Hempeles were indicted for drug offenses.

The trial court suppressed the evidence from the warrantless garbage searches because the State had not proven that the trash had been left for collection or had been seized on public property. The court therefore held that the search warrant for the house was invalid because the only other basis for it—the information provided by the informant six months earlier—had been stale when the warrant issued.

–B–

In *State v. Pasanen* the Boonton police began surveilling the home of defendant, James J. Pasanen, after learning from confidential sources that "drug activity" was taking place there. When the surveillance disclosed that people previously convicted of drug-related crimes were frequenting the house, the police started to monitor the garbage there. On seven occasions they conducted warrantless seizures and searches of gray plastic garbage bags placed near the street. The bags contained drug paraphernalia and traces of illegal drugs. After obtaining a search warrant, the police found quantities of cocaine, heroin, and marijuana in defendant's house.

Following his indictment for drug offenses, defendant challenged the warrantless garbage searches and the search warrant for the house. Denying the suppression motion, the trial

court held that defendant's privacy expectation in his trash had not been absolute. Because defendant had had only a qualified privacy expectation in his garbage, the police had needed only reasonable suspicion, rather than a warrant based on probable cause, for the search. The trial court held that the police had had "some plausible grounds for suspicion": two informants had told them that drug activity was taking place at defendant's house; people with prior drug convictions had been frequenting that address; and one informant had claimed that a resident had approached him about purchasing drugs. The trial court therefore found that the garbage searches and the ensuing search warrant had been valid. Defendant thereafter pled to one count of the indictment.

–C–

The Appellate Division reviewed these two cases together. 229 *N.J.Super.* 553, 555, 552 *A.*2d 212 (1989). After observing that the protections of the fourth amendment to the United States Constitution do not apply to garbage left for collection, the Appellate Division held that article I, paragraph 7 of the New Jersey Constitution prohibits unreasonable searches and seizures of such garbage. Determining that a person retains a qualified, but not an absolute, expectation of privacy in garbage left for collection, the Appellate Division adopted the reasonable-suspicion standard used by the trial court in *Pasanen.*

The Appellate Division found that the police had had a reasonable basis for searching Pasanen's garbage because two "reliable informants" had told them about "drug dealing." 229 *N.J.Super.* at 562, 552 *A.*2d 212. Therefore the trial court in *Pasanen* had been correct in upholding the searches and denying the suppression motion.

Although disagreeing with the reasoning of the trial court in *Hempele,* the Appellate Division nevertheless affirmed the suppression order in that case. It held that the questions of whether the trash had been left for collection and whether the

trash had been left on public property were not controlling. Instead, after finding that the defendants had retained a qualified privacy expectation, the Appellate Division determined that because of the "patent staleness" of the information that had motivated the searches, the police had not had reasonable suspicion. *Id.* at 564, 552 *A.*2d 212. The searches had therefore violated the New Jersey Constitution. Because the validity of the warrant for the house depended on the fruits of the illegal garbage searches, the items seized during the house search were to be suppressed as well.

We granted the State's motion for leave to appeal in *Hempele*, 117 *N.J.* 50, 563 *A.*2d 818 (1989), and Pasanen's petition for certification, 117 *N.J.* 46, 563 *A.*2d 816 (1989).

## II

We consider first whether the garbage searches in these two cases violated the United States Constitution.

### -A-

In *California v. Greenwood,* 486 *U.S.* 35, 108 *S.Ct.* 1625, 100 *L.Ed.*2d 30 (1988), the United States Supreme Court held that the fourth amendment does not prohibit unreasonable searches and seizures of garbage left for collection in an area accessible to the public. In that case a police investigator learned that a truck carrying illegal drugs was *en route* to Billy Greenwood's home. A neighbor also complained about the heavy late-night traffic in front of Greenwood's residence. According to the neighbor, the vehicles would remain at Greenwood's house for only a few minutes. The investigator observed the traffic patterns for herself and followed a truck from Greenwood's place to a house targeted in a previous narcotics investigation.

The officer later asked the neighborhood's regular garbage collector to give her the trash bags that Greenwood had left on his curb. During a warrantless search of the bags, the investigator found items indicative of drug use. She then obtained a

search warrant for the house. The subsequent search turned up quantities of cocaine and hashish. The police arrested Greenwood and Dyanne Van Houten on narcotics charges.

While free on bail, Greenwood continued to receive many late-night visitors at his house. Another warrantless garbage search conducted in the same manner as the first turned up additional evidence of drug use. After securing a second search warrant, the police discovered more narcotics in Greenwood's house. They arrested Greenwood again. Greenwood and Van Houten challenged the constitutionality of the warrantless garbage searches.

The Supreme Court held that the warrantless searches of Greenwood's garbage "would violate the Fourth Amendment only if respondents [had] manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable." *California v. Greenwood, supra,* 486 *U.S.* at 39, 108 *S.Ct.* at 1628, 100 *L.Ed.*2d at 36. Ruling that a privacy expectation in garbage is not reasonable, the Court rejected the defendants' argument.

The Court decided that people lose any reasonable expectation of privacy in their trash by leaving it in bags alongside the street, because such garbage is vulnerable to an unscrupulous person or scavenging animal. Furthermore, garbage is placed on the curb for the specific purpose of having a third party remove it. The defendants should have realized that the trash collector might look through the garbage or allow another person to do so. The Court added that the fourth amendment does not protect what a person knowingly exposes to the public because "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public." *Id.* at 41, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 37.

Having decided that an expectation of privacy in trash left for collection in an area accessible to the public is unreasonable, the Court found it unnecessary to determine whether the defen-

dants had manifested a subjective expectation of privacy. The warrantless garbage searches did not violate the fourth amendment.

–B–

■ The facts in *Greenwood* are almost identical to those here. The primary difference is that in *Hempele* and *Pasanen* the police themselves removed the garbage from the curb, whereas in *Greenwood* a trash collector gave the garbage to the police. That distinction has no fourth-amendment significance. The Supreme Court did not rely on the fact that the police in *Greenwood* had not removed the garbage themselves; the trash collector there acted as an agent of the police when he took the trash. We agree with the State that "removal of trash by garbage collectors who, minutes later, turn the trash over to the police is no different [from] direct removal of the same trash by the police themselves." See also *People v. Pinnix*, 174 *Mich.App.* 445, 448, 436 *N.W.*2d 692, 694 (no "meaningful" distinction between *Greenwood* and the case at bar, in which "the police, and not a trash collector acting for the police, removed the garbage from the curbside"), *appeal denied*, 433 *Mich.* 893 (1989).

Counsel for the Hempeles belabor a second factual difference between *Greenwood* and *Hempele:* whereas Greenwood left his trash on public property, the Hempeles' bags may have been technically within their curtilage. The Hempeles argue that *Greenwood* therefore *requires* the suppression of the garbage-search evidence. According to counsel, a warrantless garbage search is valid under *Greenwood* only if (1) the garbage was placed outside the defendant's curtilage, and (2) the garbage was set out for collection.

Counsel distort *Greenwood*. Although that case did involve garbage placed for collection outside the curtilage, the Supreme Court never suggested that those two circumstances were determinative. Nowhere did the Court indicate that the defen-

dants' privacy expectation would have been more reasonable had their garbage technically been on their side of the property line. To quote the Court: "Our conclusion [is] that society would not accept as reasonable respondents' claim to an expectation of privacy in trash left for collection *in an area accessible to the public* * * *." *California v. Greenwood, supra,* 486 *U.S.* at 41, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 37 (emphasis added).

■ The privacy expectation is the same whether the garbage is left outside or just inside the property line. As the Appellate Division noted, "[w]hile the distinction between garbage placed for storage and garbage placed for collection might be significant * * * in some cases, it is meaningless here where the container searched was located in an unenclosed area no more than eight feet from the curb." 229 *N.J.Super.* at 564, 552 *A.*2d 212.

■ Under *Greenwood* the issue is whether the garbage was left at a location "accessible to the public." *State v. Trahan,* 229 *Neb.* 683, 689, 428 *N.W.*2d 619, 623 (no reasonable expectation of privacy in garbage placed for collection four feet from defendant's trailer), *cert. denied,* 488 *U.S.* 995, 109 *S.Ct.* 561, 102 *L.Ed.*2d 586 (1988); *see also United States v. Kramer,* 711 *F.*2d 789 (7th Cir.) (fourth amendment did not prohibit warrantless removal of trash bags located within fence in front of defendant's home), *cert. denied,* 464 *U.S.* 962, 104 *S.Ct.* 397, 78 *L.Ed.*2d 339 (1983). But see *United States v. Certain Real Property,* 719 *F.Supp.* 1396, 1406 (E.D.Mich.1989), in which the seized garbage was *"not '*in an area particularly suited for public inspection,' " where a police officer, posing as a garbage collector, drove a scooter down the driveway and removed a closed garbage bag from behind the house (quoting *California v. Greenwood, supra,* 486 *U.S.* at 40–41, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 37). The Hempeles left their garbage at a location accessible to the public. They cannot escape the force of *Greenwood.*

The garbage searches in both cases were valid under the fourth amendment.

### III

We now determine whether the New Jersey Constitution protects curbside garbage from unreasonable searches and seizures. Despite the similarity between the text of article I, paragraph 7 of the New Jersey Constitution and the text of the fourth amendment, we have found on several occasions that the former "affords our citizens greater protection against unreasonable searches and seizures than does the fourth amendment." *State v. Novembrino,* 105 *N.J.* 95, 145, 519 *A.*2d 820 (1987) (unlike fourth amendment, article I, paragraph 7 does not provide for good-faith exception to the exclusionary rule); *see State v. Hunt,* 91 *N.J.* 338, 450 *A.*2d 952 (1982) (New Jersey Constitution protects privacy interest in phone-toll billing records even though federal constitution does not); *State v. Alston,* 88 *N.J.* 211, 440 *A.*2d 1311 (1981) (criteria for standing to challenge validity of searches and seizures are more liberal under article I, paragraph 7 than under fourth amendment); *State v. Johnson,* 68 *N.J.* 349, 346 *A.*2d 66 (1975) (State faces heavier burden to show validity of non-custodial consent to a search under New Jersey Constitution than under United States Constitution); *cf. State v. Tanaka,* 67 *Haw.* 658, 701 *P.*2d 1274 (1985) (Hawaii Constitution prohibits warrantless garbage searches); *People v. Krivda,* 5 *Cal.*3d 357, 486 *P.*2d 1262, 96 *Cal.Rptr.* 62 (1971) (garbage left outside curtilage is constitutionally protected), *vacated,* 409 *U.S.* 33, 93 *S.Ct.* 32, 34 *L.Ed.*2d 45 (1972) (remanded for determination of whether state or federal constitution was basis for holding), *on remand,* 8 *Cal.*3d 623, 504 *P.*2d 457, 105 *Cal.Rptr.* 521 (reincorporating original holding, based on both California Constitution and United States Constitution), *cert. denied,* 412 *U.S.* 919, 93 *S.Ct.* 2734, 37 *L.Ed.*2d 145 (1973).

■ In interpreting the New Jersey Constitution, we look for direction to the United States Supreme Court, whose opinions can provide "valuable sources of wisdom for us." *State v. Hunt, supra,* 91 *N.J.* at 355, 450 *A.*2d 952 (Pashman, J., concurring). But although that Court may be a polestar that guides us as we navigate the New Jersey Constitution, we bear ultimate responsibility for the safe passage of our ship. Our eyes must not be so fixed on that star that we risk the welfare of our passengers on the shoals of constitutional doctrine. In interpreting the New Jersey Constitution, we must look in front of us as well as above us.

For most of our country's history, the primary source of protection of individual rights has been state constitutions, not the federal Bill of Rights. See Abrahamson, "Reincarnation of State Courts," 56 *Sw.L.J.* 951 (1981). The genius of federalism is that the fundamental rights of citizens are protected not only by the United States Constitution but also by the laws of each of the states. The system may be untidy on occasion, but that untidiness invests it with "a vibrant diversity." Pollock, "Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts," 63 *Tex.L. Rev.* 977, 979 (1985). "As tempting as it may be to harmonize results under the state and federal constitutions, federalism contemplated that state courts may grant greater protection to individual rights if they choose." *Id.* at 980.

■ When the United States Constitution affords our citizens less protection than does the New Jersey Constitution, we have not merely the authority to give full effect to the State protection, we have the duty to do so. Every judicial officer in New Jersey takes an oath to "support the Constitution of this State * * *." *N.J.S.A.* 41:2A–6. Bound to fulfill our covenant with the people of New Jersey, we must "respectfully part company" with the Supreme Court when we find that it has provided our citizens with "inadequate protection against unreasonable searches and seizures * * *." *State v. Alston, supra,* 88 *N.J.*

at 226, 440 *A*.2d 1311. In so doing, we manifest no disrespect for the nation's highest court but merely honor our "obligation to uphold [our] own constitution." *State v. Lund*, 119 *N.J.* 35, 38, 573 *A*.2d 1376 (1990) (Pollock, J., concurring).

Cognizant of the diversity of laws, customs, and mores within its jurisdiction, the United States Supreme Court is necessarily "hesitant to impose on a national level far-reaching constitutional rules binding on each and every state." *State v. Hunt, supra*, 91 *N.J.* at 358, 450 *A*.2d 952 (Pashman, J., concurring). That Court establishes no more than the floor of constitutional protection. *State v. Gilmore*, 103 *N.J.* 508, 524, 511 *A*.2d 1150 (1986). The Supreme Court must be especially cautious in fourth-amendment cases. When determining whether a search warrant is necessary in a specific circumstance, the Court must take note of the disparity in warrant-application procedures among the several states, and must consider whether a warrant requirement in that situation might overload the procedure in any one state. In contrast, we are fortunate to have in New Jersey a procedure that allows for the speedy and reliable issuance of search warrants based on probable cause. See *State v. Novembrino, supra*, 105 *N.J.* at 150–52, 156, 519 *A*.2d 820. A warrant requirement is not so great a burden in New Jersey as it might be in other states.

The Supreme Court itself has implied that garbage searches are an appropriate issue on which state courts may rise above "the lowest common denominator," *State v. Lund, supra*, 119 *N.J.* at 38, 573 *A*.2d 1376 (Pollock, J., concurring). In holding that the fourth amendment does not protect garbage, the Court suggested that "[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution." *California v. Greenwood, supra*, 486 *U.S.* at 43, 108 *S.Ct.* at 1630, 100 *L.Ed.*2d at 39.

Before embarking on our analysis of the New Jersey Constitution, we emphasize that "[t]he federal cases that we cite in

support of our interpretation of the New Jersey Constitution 'are being used only for the purpose of guidance, and do not themselves compel the result that [this Court] has reached.'" *State v. Bruzzese*, 94 *N.J.* 210, 217 n. 3, 463 *A.*2d 320 (1983) (quoting *Michigan v. Long*, 463 *U.S.* 1032, 1041, 103 *S.Ct.* 3469, 3476, 77 *L.Ed.*2d 1201, 1214 (1983)), *cert. denied*, 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984).

## IV

■ In determining whether the warrantless search of defendants' garbage violated article I, paragraph 7 of the New Jersey Constitution, we apply a slightly different test from the one used in *California v. Greenwood, supra*, 486 *U.S.* 35, 108 *S.Ct.* 1625, 100 *L.Ed.*2d 30. In that case the Supreme Court turned to the two-pronged inquiry first enunciated by Justice Harlan in *Katz v. United States*, 389 *U.S.* 347, 88 *S.Ct.* 507, 19 *L.Ed.*2d 576 (1967). Under that analysis the determination of fourth-amendment protections rests on "a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 *S.Ct.* at 516, 19 *L.Ed.*2d at 588 (Harlan, J., concurring).

We decline to follow that test because a defendant's "actual (subjective) expectation of privacy" does not determine the New Jersey Constitution's restraints on the State's power to search and seize. Justice Harlan himself apparently reached a similar conclusion when he later wrote that the analysis under *Katz* "must, in my view, transcend the search for subjective expectations * * *." *United States v. White*, 401 *U.S.* 745, 786, 91 *S.Ct.* 1122, 1143, 28 *L.Ed.*2d 453, 478 (1971) (Harlan, J., dissenting). The Supreme Court has admitted the irrelevance of subjectivity in extreme cases:

> For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects. Similarly, if a refugee

from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances * * * those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.

[*Smith v. Maryland*, 442 *U.S.* 735, 741 n. 5, 99 *S.Ct.* 2577, 2580 n. 5, 61 *L.Ed.*2d 220, 227 n. 5 (1979).]

If people need not exhibit a subjective expectation of privacy in "extreme" cases, such a showing should be unnecessary in "ordinary" cases as well.

Moreover, the two-prong analysis entails an arbitrary distinction between facts that manifest a subjective privacy expectation and those that indicate the reasonableness of the privacy expectation. We are unaware of any reasoned discourse distinguishing which evidence goes to the first prong and which evidence goes to the second. Both prongs are dependent on objective criteria, as would be apparent in a case involving the constitutionality of a warrantless search of a purse made of clear plastic. Because an expectation of privacy in the contents of a handbag can be reasonable, *State v. Hill*, 115 *N.J.* 169, 172, 557 *A.*2d 322 (1989), the question would be whether the transparency of the purse affects the constitutionality of the search. One might argue that although a privacy expectation in the contents of a purse is normally reasonable, the owner here failed to "exhibit an actual (subjective) expectation of privacy" because the purse was transparent. *Katz v. United States, supra*, 389 *U.S.* at 361, 88 *S.Ct.* at 516, 19 *L.Ed.*2d at 588 (Harlan, J., concurring). On the other hand, one might argue that a subjective expectation of privacy in the contents of a transparent purse is not "one that society is prepared to recognize as 'reasonable.' " *Ibid.*

Thus the objective fact of the transparency of the purse could be evidence either of a failure to manifest a subjective privacy expectation or of the unreasonableness of that subjective privacy expectation. The decision to apply that fact to one prong rather than the other would be arbitrary. That choice, further-

more, would probably not affect the final determination of whether the contents are constitutionally protected. We conclude, therefore, that the manifestation of a subjective privacy expectation should not be a separate requirement for protection under article I, paragraph 7. Instead, the New Jersey Constitution requires only that an expectation of privacy be reasonable.

Although the one-step test should not change the result in the vast majority of cases, in those instances in which it would, such as the extreme situations discussed in *Smith v. Maryland, supra,* 442 *U.S.* at 741 n. 5, 99 *S.Ct.* at 2580 n. 5, 61 *L.Ed.*2d at 227 n. 5, it should correct the anomalous results dictated by the two-prong approach. The one-step test better reflects the underlying principles of search-and-seizure law. Article I, paragraph 7 does not "ask[ ] what we expect of government. [It] tell[s] us what we should demand of government." Amsterdam, "Perspectives On the Fourth Amendment," 58 *Minn.L. Rev.* 349, 384 (1974) [hereinafter Amsterdam]. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" when there can be a reasonable expectation of privacy in them. *N.J. Const. of 1947* art. I, para. 7.

-A-

■ In determining the reasonableness of an expectation of privacy in curbside garbage left for collection, we start from the premise that "[e]xpectations of privacy are established by general social norms." *Robbins v. California,* 453 *U.S.* 420, 428, 101 *S.Ct.* 2841, 2847, 69 *L.Ed.*2d 744, 751 (1981) (plurality opinion), *overruled on other grounds, United States v. Ross,* 456 *U.S.* 798, 102 *S.Ct.* 2157, 72 *L.Ed.*2d 572 (1982); *see also California v. Greenwood, supra,* 486 *U.S.* at 43, 108 *S.Ct.* at 1631, 100 *L.Ed.*2d at 39 (fourth-amendment analysis "must turn on such factors as 'our societal understanding that certain areas deserve the most scrupulous protection from government invasion' ") (quoting *Oliver v. United States,* 466 *U.S.* 170, 178,

104 *S.Ct.* 1735, 1741, 80 *L.Ed.*2d 214, 224 (1984)) (emphasis deleted). The "ultimate question" is whether, if garbage searches are "permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society." Amsterdam, *supra,* 58 *Minn.L.Rev.* at 403. With that question in mind, we first examine whether it is reasonable for a person to *want* to keep the contents of his or her garbage private.

Clues to people's most private traits and affairs can be found in their garbage. "[A]lmost every human activity ultimately manifests itself in waste products and * * * any individual may understandably wish to maintain the confidentiality of his refuse." *State v. Smith,* 510 *P.*2d 793, 798 (Alaska) (upholding warrantless search of dumpster), *cert. denied,* 414 *U.S.* 1086, 94 *S.Ct.* 603, 38 *L.Ed.*2d 489 (1973). A plethora of personal information can be culled from garbage:

> A single bag of trash testifies eloquently to the eating, reading, and recreational habits of the person who produced it. A search of trash, like a search of the bedroom, can relate intimate details about sexual practices, health, and personal hygiene. Like rifling through desk drawers or intercepting phone calls, rummaging through trash can divulge the target's financial and professional status, political affiliations and inclinations, private thoughts, personal relationships, and romantic interests.
>
> [*California v. Greenwood, supra,* 486 *U.S.* at 50, 108 *S.Ct.* at 1634, 100 *L.Ed.*2d at 43 (Brennan, J., dissenting).]

See also *State v. Tanaka, supra,* 67 *Haw.* at 662, 701 *P.*2d at 1276–77 ("[b]usiness records, bills, correspondence, magazines, tax records, and other telltale refuse can reveal much about a person's activities, associations, and beliefs").

Most people seem to have an interest in keeping such matters private; few publicize them voluntarily. Undoubtedly many would be upset to see a neighbor or stranger sifting through their garbage, perusing their discarded mail, reading their bank statements, looking at their empty pharmaceutical bottles, and checking receipts to see what videotapes they rent. The California Supreme Court commented that it could "readily ascribe

many reasons why residents would not want their castaway clothing, letters, medicine bottles or other telltale refuse and trash to be examined by neighbors or others * * *. Half truths leading to rumor and gossip may readily flow from an attempt to 'read' the contents of another's trash." *People v. Edwards*, 71 *Cal*.2d 1096, 1104, 458 *P*.2d 713, 718, 80 *Cal.Rptr*. 633, 638 (1969) (garbage left inside curtilage is constitutionally protected).

Given the secrets that refuse can disclose, it is reasonable for a person to prefer that his or her garbage remain private.

–B–

Like the fourth amendment, article I, paragraph 7 "provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross, supra*, 456 *U.S.* at 822–23, 102 *S.Ct*. at 2171–72, 72 *L.Ed*.2d at 592. Under that principle people can have a reasonable expectation of privacy in the contents of a "cosmetic bag or handbag," *State v. Hill, supra*, 115 *N.J.* at 172, 557 *A*.2d 322; a "soft black leather case with a snap * * * normally used to carry film," *State in Interest of A.R.*, 216 *N.J.Super*. 280, 283, 523 *A*.2d 678 (App.Div.1987); a "locked attache case," *State v. Pace*, 171 *N.J.Super*. 240, 245, 408 *A*.2d 808 (App.Div.1979), *certif. denied*, 84 *N.J.* 384, 420 *A*.2d 314 (1980); a "sealed package about the size of a shirt box," *State v. Pohle*, 160 *N.J.Super*. 576, 582, 390 *A*.2d 692 (Law Div.1978), *rev'd on other grounds*, 166 *N.J.Super*. 504, 400 *A*.2d 109 (App.Div.), *certif. denied*, 81 *N.J.* 328, 407 *A*.2d 1202 (1979); a "satchel," *State v. Parker*, 153 *N.J.Super*. 481, 488, 380 *A*.2d 291 (App.Div.1977); a "double-locked footlocker," *United States v. Chadwick*, 433 *U.S.* 1, 11, 97 *S.Ct*. 2476, 2483, 53 *L.Ed*.2d 538, 548 (1977); a "comparatively small, unlocked suitcase," *Arkansas v. Sanders*, 442 *U.S.* 753, 762 n. 9, 99 *S.Ct*. 2586, 2592 n. 9, 61 *L.Ed*.2d 235, 244 n. 9 (1979); a "totebag," *Robbins v. California, supra*, 453 *U.S.* at

422, 101 *S.Ct.* at 2844, 69 *L.Ed.*2d at 748; and "packages wrapped in green opaque plastic," *ibid.*

There is no "constitutional distinction between 'worthy' and 'unworthy' containers * * *." *United States v. Ross, supra,* 456 *U.S.* at 822, 102 *S.Ct.* at 2171, 72 *L.Ed.*2d at 592. "[P]aper bags, locked trunks, lunch buckets, and orange crates" all receive the same treatment. *Ibid.* A privacy expectation does not depend on the value or quality of the container:

> [A] traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf [can] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attache case. [*Ibid.*]

"[N]o court, no constable, no citizen, can sensibly be asked to distinguish the relative 'privacy interests' in a closed suitcase, briefcase, portfolio, duffel bag, or box." *Robbins v. California, supra,* 453 *U.S.* at 427, 101 *S.Ct.* at 2846, 69 *L.Ed.*2d at 751 (plurality opinion).

The critical issue is whether the container conceals its contents from plain view. *United States v. Ross, supra,* 456 *U.S.* at 822–23, 102 *S.Ct.* at 2171–72, 72 *L.Ed.*2d at 592; *Robbins v. California, supra,* 453 *U.S.* at 427, 101 *S.Ct.* at 2846, 69 *L.Ed.*2d at 751 (plurality opinion). Because ordinary opaque garbage bags conceal their contents from plain view, the presumption is that an expectation of privacy in the contents is reasonable.

–C–

The State relies on the three reasons cited in *Greenwood* for excepting garbage-search cases from the "opaque container" rule: garbage left on the curb is not invulnerable to inspection by outsiders; the disposal of garbage bags is entrusted to a third party; and the police need not "avert their eyes" from evidence visible to the public. The State further contends that garbage is not constitutionally protected because it is pervasively regulated and because it is abandoned. Those

five arguments are unconvincing, whether considered individually or together.

-1-

■ The Court held in *Greenwood* that an expectation of privacy in plastic garbage bags left at the side of the street is not reasonable because the bags are "readily accessible to animals, children, scavengers, snoops, and other members of the public." 486 *U.S.* at 40, 108 *S.Ct.* at 1628, 100 *L.Ed.*2d at 36–37 (footnotes omitted).

■ The accessibility of garbage to outsiders, however, is not dispositive, because a person can maintain a privacy interest in something that is not completely invulnerable to prying eyes. Otherwise article I, paragraph 7 would protect only that which is under lock-and-key. (Even then, locksmiths, lock pickers, and people wielding sticks of dynamite could gain access.) Justice Brennan expanded on the idea:

> The mere *possibility* that unwelcome meddlers *might* open and rummage through [trash] containers does not negate the expectation of privacy in its contents any more than the possibility of a burglary negates an expectation of privacy in the home; or the possibility of a private intrusion negates an expectation of privacy in an unopened package; or the possibility that an operator will listen in on a telephone conversation negates an expectation of privacy in the words spoken on the telephone.
>
> [*California v. Greenwood,* 486 *U.S.* at 54, 108 *S.Ct.* at 1636, 100 *L.Ed.*2d at 45–46 (Brennan, J., dissenting).]

The government could not arbitrarily search parked automobiles even though "[e]very person who parks his or her car on a side street in Greenwich Village voluntarily runs the risk that it will be burglarized." Amsterdam, *supra,* 58 *Minn.L.Rev.* at 406.

Unreasonable police searches are often impermissible in areas accessible to other third parties. For example, a government employee can have a reasonable expectation of privacy in his or her office even though "it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent

access to an individual's office." *O'Connor v. Ortega,* 480 *U.S.* 709, 717, 107 *S.Ct.* 1492, 1497, 94 *L.Ed.*2d 714, 723 (1987) (plurality opinion). The constitutional prohibition on unreasonable government searches " 'does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer.' " *Ibid.* (quoting 480 *U.S.* at 731, 107 *S.Ct.* at 1505, 94 *L.Ed.*2d at 732 (Scalia, J., concurring in the judgment)).

The underlying principle of *O'Connor* is that a person's expectation of privacy can differ in regard to different classes of people:

> [W]hile it may not be objectively reasonable for a person to expect privacy as to one class of persons or persons with one purpose, he may reasonably expect privacy as to the same or other classes with other purposes. A person may not expect privacy in his * * * backyard as against children at play or parents looking for lost or tardy children. Yet he may subjectively expect and objectively be entitled to expect privacy as against policemen making a "dragnet" search of * * * a whole neighborhood of backyards on the assumption that if they search long enough and far enough they will find some evidence of some crime.
>
> [*State v. Stanton,* 7 *Or.App.* 286, 296, 490 *P.*2d 1274, 1279 (1971) (privacy expectation in a farm field is unreasonable), *overruled, State v. Walle,* 52 *Or.App.* 963, 630 *P.*2d 377 (1981) (privacy expectation in an open field can be reasonable).]

Although a person may realize that an unwelcome scavenger might sort through his or her garbage, "such expectations would not necessarily include a detailed, systematized inspection of the garbage by law enforcement personnel." *Smith v. State, supra,* 510 *P.*2d at 803 (Rabinowitz, C.J., dissenting). "The fact that dogs or others may occasionally, and wrongfully, * * * go through one's 'private' trash does not justify others in doing so." *State v. Schultz,* 388 *So.*2d 1326, 1330–31 (Fla.App. 1980) (Anstead, J., dissenting). A person's awareness that leaving garbage for disposal may entail privacy risks "hardly means that government is constitutionally unconstrained in adding to those risks." *Amsterdam, supra,* 58 *Minn.L.Rev.* at 406. There is a difference between a homeless person scaveng-

ing for food and clothes, and an officer of the State scrutinizing the contents of a garbage bag for incriminating materials.

Leaving a garbage bag alongside the street near one's home is similar in some respects to leaving a letter in one's curbside mailbox for the carrier to pick up. Like a trash bag, that letter is "readily accessible" to snoops and others. Nevertheless, an expectation of privacy in that letter is reasonable. It is doubtful that article I, paragraph 7 would allow the State arbitrarily to open letters left in people's mailboxes. Moreover, just as federal law prohibits tampering with letters left in mailboxes, see 18 *U.S.C.A.* § 1705, local ordinances prohibit garbage-picking. See, *e.g.*, Morristown, N.J., Code § 109–4 ("it shall be unlawful for any person to * * * disturb * * * garbage * * * placed on any curb, street or public place").

A privacy expectation in garbage can be reasonable even though the contents are not invulnerable to inspection by outsiders. We expect officers of the State to be more knowledgeable and respectful of people's privacy than are dogs and curious children. *See State v. Schultz, supra*, 388 *So.*2d at 1330 (Anstead, J., dissenting).

–2–

■■■ The Supreme Court also rejected a privacy expectation in garbage because the defendants had placed their garbage on the curb for removal by a third party "who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." *California v. Greenwood, supra*, 486 *U.S.* at 40, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 37. That premise is predicated on three assumptions: first, that garbage collectors have the right to look through closed garbage bags; second, that garbage collectors have sufficient authority over the bags to consent to a police search; third, that because garbage collectors can consent to a search, the police need neither a warrant *nor* consent for a search. The first is debatable. The second is dubious. The third is downright disturbing.

We are not sure whether garbage collectors have the legal right to look through closed trash bags. Even if they do, it is unclear whether they "possess[ ] common authority over or other sufficient relationship" to the bags to consent to a search. *See United States v. Matlock*, 415 *U.S.* 164, 171, 94 *S.Ct.* 988, 993, 39 *L.Ed.*2d 242, 250 (1974). People who have legal access to a constitutionally-protected area often do not have authority to consent to a police search. For example, a landlord who has the right to enter a tenant's house "to view waste" does not have authority to consent to a police search of the premises. *Chapman v. United States*, 365 *U.S.* 610, 616–17, 81 *S.Ct.* 776, 779–80, 5 *L.Ed.*2d 828, 833 (1961).

We need not pause over either of the first two propositions because the third is so plainly wrong. Even if a landlord could enter a tenant's premises and did have sufficient common authority to "permit[ ] others, such as the police, to do so," *California v. Greenwood, supra*, 486 *U.S.* at 40, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 37, the police certainly could not conduct a warrantless search without the landlord's consent. There is no principle "to the effect that the police are free to do what some individual has been authorized to do." 1 W. LaFave, *Search and Seizure* § 2.6(c), at 48 (1990 Supp.) (emphasis omitted) [hereinafter LaFave]. The possibility of consent by a third party does not abolish all constitutional protections against unreasonable searches and seizures. A wife can have a reasonable expectation of privacy in her home even though her husband can consent to a search. The police could not search her house without a warrant or consent just because her husband *could* have consented. Thus even if a trash collector does have sufficient authority to consent to a garbage search, it does not follow that any reasonable expectation of privacy in garbage is lost and that the police can therefore search the bags without such consent.

We realize that in *Greenwood* a garbage collector turned the bags over to the police. However, the Court neither relied on that fact nor implied that the garbage collector had "consent-

ed" to the search. Rather, it emphasized that there can be "no reasonable expectation of privacy" in garbage deposited " 'for the express purpose of having strangers take it.' " 486 *U.S.* at 41, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 37 (quoting *United States v. Reicherter,* 647 *F.*2d 397, 399 (3rd Cir.1981)). Moreover, the Court's reliance on *Reicherter* suggests that its position would have been the same even if the police had seized Greenwood's garbage on their own. In *Reicherter* the police, posing as garbage collectors, seized the trash themselves.

Nor did the Court strengthen its view by saying that " 'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.' " 486 *U.S.* at 41, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 37 (quoting *Smith v. Maryland, supra,* 442 *U.S.* at 743–44, 99 *S.Ct.* at 2581–82, 61 *L.Ed.*2d at 229). That principle is not relevant here; it applies only when a person "physically expose[s] the evidence to a third party." Note, "The Supreme Court—Leading Cases," 102 *Harv.L.Rev.* 143, 195 (1988); *see, e.g., United States v. Miller,* 425 *U.S.* 435, 442, 96 *S.Ct.* 1619, 1623, 48 *L.Ed.*2d 71, 79 (1976) (bank depositor has no "legitimate 'expectation of privacy' " in financial information "voluntarily conveyed to * * * banks and exposed to their employees").

 Conveying information to another is different from conveying an opaque bag containing information. People do not compromise their privacy interest in the contents of a container when they turn that container over to a third party:

> Were it otherwise, a letter or package would lose all Fourth Amendment protection when placed in a mail box or other depository with the "express purpose" of entrusting it to the postal officer or a private carrier; those bailees are just as likely as trash collectors (and certainly have greater incentive) to "sor[t] through" the personal effects entrusted to them, "or permi[t] others, such as police to do so."
>
> [*California v. Greenwood,* 486 *U.S.* at 55, 108 *S.Ct.* at 1630, 100 *L.Ed.*2d at 46 (Brennan, J., dissenting).]

Materials given to public or private carriers for delivery are constitutionally protected. *United States v. Jacobsen,* 466 *U.S.* 109, 114, 104 *S.Ct.* 1652, 1657, 80 *L.Ed.*2d 85, 94 (1984); *United*

States v. Van Leeuwen, 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed.2d 282, 284–85 (1970); Ex parte Jackson, 96 U.S. 727, 732, 24 L.Ed. 877, 879 (1878). That principle suggests that garbage does not lose constitutional protection merely because it is handed over to a collector.

Here, defendants did not inform the collector of the contents of their garbage. The only information conveyed was the number, type, and weight of the bags. "When someone deposits personal letters into her garbage bags, it could not be seriously maintained that she voluntarily and knowingly mean[s] to communicate the contents of such letters to the collectors or police." Smith v. State, supra, 510 P.2d at 804 (Rabinowitz, C.J., dissenting). "[E]xposure of concealed garbage is neither required nor anticipated in the case of garbage collection." Note, supra, 102 Harv.L.Rev. at 196.

 Entrusting the disposal of a trash bag to the garbage collector does not negate a reasonable expectation of privacy in the contents. It should be reasonable to expect that those who are authorized to remove trash will do so in the manner provided by ordinance or private contract. See State v. Schultz, supra, 388 So.2d at 1330 (Anstead, J., dissenting).

–3–

The Court in Greenwood also cited the maxim that "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public." 486 U.S. at 41, 108 S.Ct. at 1629, 100 L.Ed.2d at 37. That assertion, although obviously true, is hardly relevant. The question here is not whether the police should "avert their eyes," but whether they can dig through garbage that is concealed from the public eye. The cases here might be different had the garbage been strewn across the front yard for all to see. Under those conditions these defendants might have forsaken any privacy expectation. See Peo-

*ple v. Krivda, supra,* 5 *Cal.*3d at 366–67, 486 *P.*2d at 1268, 96 *Cal.Rptr.* at 68. That situation, however, is not now before us.

After referring to the "aversion" principle, *Greenwood* cited *Katz* for the proposition that " '[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' " 486 *U.S.* at 41, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 37 (quoting *Katz v. United States, supra,* 389 *U.S.* at 351, 88 *S.Ct.* at 511, 19 *L.Ed.*2d at 576). The use of that quotation is curious because immediately following that sentence in *Katz* is a more appropriate passage: "What a person * * * seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States, supra,* 389 *U.S.* at 351–52, 88 *S.Ct.* at 511, 19 *L.Ed.*2d at 582. Although garbage bags are placed in areas accessible to the public, the *contents* are not exposed to the public.

By enclosing their trash in opaque bags, people can maintain the privacy of their garbage even though they may place them in an area accessible to the public. "Aversion" simply does not apply.

–4–

The State argues that the regulation of garbage collection in New Jersey "greatly diminishe[s]" any expectation of privacy. In an attempt to show the pervasiveness of government regulation, the State refers to several statutes: Mandatory Statewide Recycling Program, *L.*1987, *c.* 102, sec. 1 (statement of findings and declarations); *N.J.S.A.* 40:55D–2a (Municipal Land Use Law); *N.J.S.A.* 40:48–2.13 (brush and weed removal); *N.J.S.A.* 26:3B–7 (illegal to accumulate "filth"); *N.J.S.A.* 13:1E–93 (legislative finding on importance of recycling); and *N.J.S.A.* 13:1E–99.3 (illegal to litter). The State does not indicate, however, how those statutes, with the possible exception of the Recycling Program, serve to reduce a privacy expectation in garbage set out for collection.

Furthermore, although government regulation can reduce a privacy expectation, it cannot completely preclude the application of the protections of article I, paragraph 7. *State v. Williams*, 84 *N.J.* 217, 225, 417 *A.*2d 1046 (1980) (rejecting as "unsound the notion that persons doing business in a strictly regulated industry * * * waive their Fourth Amendment rights"). Government regulation becomes relevant only once it has been determined that constitutional protections do apply. It can then affect the requisite cause for a reasonable search and seizure. *See, e.g., Skinner v. Railway Labor Executives' Ass'n*, 489 *U.S.* 602, ——, 109 *S.Ct.* 1402, 1418–19, 103 *L.Ed.*2d 639, 666–67 (1989) (fourth amendment applies to drug testing of railroad employees, but the pervasive regulation of that industry diminishes the employees' expectation of privacy and weakens the presumption for a warrant requirement). Although regulation might reduce the requisite cause for a search, it cannot prevent article I, paragraph 7 from applying at all. Otherwise the government could repeal article I, paragraph 7 through regulation. The State cites no cases to the contrary.

If anything, the regulation of garbage in New Jersey strengthens the presumption that the protections of article I, paragraph 7 should apply. Many local ordinances prohibit garbage-picking. See, *e.g.*, Morristown, N.J., Code § 109–4. Others prohibit scavenging without a license. See, *e.g.*, Township of Boonton, N.J., Ordinance to License and Regulate Scavengers (Feb. 4, 1969). We doubt that such ordinances are enacted to protect the privacy of people's garbage. See *United States v. Vahalik*, 606 *F.*2d 99, 101 (5th Cir.1979) ("[t]he purpose of the ordinance [prohibiting unauthorized tampering of garbage] was, presumably, sanitation and cleanliness, not privacy"), *cert. denied*, 444 *U.S.* 1081, 100 *S.Ct.* 1034, 62 *L.Ed.*2d 765 (1980), and *People v. Krivda, supra*, 5 *Cal.*3d at 368 n. 1, 486 *P.*2d at 1269 n. 1, 96 *Cal.Rptr.* at 69 n. 1 (Wright, C.J., concurring and dissenting) ("ordinance[s] prohibiting tampering with trash containers by unauthorized persons * * * are typically enacted to protect the exclusive right of a city or its

authorized agent to collect the trash"). However, the relevant point is not the purpose of the ordinances but the effect they may have on people's perception that their garbage will not be violated by outsiders. Such regulations are likely to increase people's expectation that the contents of their garbage set out on the curb will remain private. Those ordinances certainly do not detract from the reasonableness of that expectation.

Other ordinances bar the stockpiling of garbage and require that it be set out for collection. See, e.g., Passaic, N.J., Code § 39–1, and Boonton, N.J., Code Art. 27, chap. A, § 2. Still others prohibit the burning of garbage. See, e.g., Florham Park, N.J., Code § 265–29B. Were it not for such regulations, people who want to maintain the privacy of their garbage could either bury it in their backyards or burn it. They would need not then fear that the garbage might be disturbed by "animals, children, scavengers, snoops, and other members of the public," *California v. Greenwood, supra,* 486 *U.S.* at 40, 108 *S.Ct.* at 1629, 100 *L.Ed.*2d at 36–37 (footnotes omitted), or by unreasonable police searches. Surely the State has the authority to regulate the disposal of garbage; but if pursuant to that authority it compels people to alter their conduct, it may not then contend that that conduct no longer deserves constitutional protection. The State cannot use its regulatory powers to repeal article I, paragraph 7.

The regulation of garbage in New Jersey does not make an expectation of privacy in garbage unreasonable.

–5–

Finally, the State argues that an expectation of privacy in garbage left on the curb for collection is unreasonable because the garbage has been "abandoned." Courts have used two different definitions of "abandonment" in search-and-seizure cases. In the traditional property-law sense, "abandonment" refers to an owner's voluntary relinquishment of a proprietary interest in property to the extent that another person may take possession and assert a superior interest. See, e.g., *United*

*States v. Shelby,* 573 *F.*2d 971, 973 (7th Cir.), *cert. denied,* 439 *U.S.* 841, 99 *S.Ct.* 132, 58 *L.Ed.*2d 139 (1978). Other courts have used "abandonment" in a constitutional sense. Under that analysis, an owner "abandons" property when he or she loses any expectation of privacy in it by discarding it. "In essence, what is abandoned is not necessarily the defendant's property, but his reasonable expectation of privacy therein." *State v. Oquist,* 327 *N.W.*2d 587, 590 (Minn.1982) (quoting *City of Saint Paul v. Vaughn,* 306 *Minn.* 337, 346, 237 *N.W.*2d 365, 371 (1975)).

"Abandonment" in the property-law sense is not dispositive of the reasonableness of a privacy expectation. "The premise that property interests control the right of the Government to search and seize has been discredited." *Katz v. United States, supra,* 389 *U.S.* at 353, 88 *S.Ct.* at 512, 19 *L.Ed.*2d at 583 (quoting *Warden v. Hayden,* 387 *U.S.* 294, 304, 87 *S.Ct.* 1642, 1648, 18 *L.Ed.*2d 782, 790 (1967)). Even the *Greenwood* majority ignored "the State's attempt to distinguish trash searches from other searches on the theory that trash is abandoned and therefore not entitled to an expectation of privacy." 486 *U.S.* at 51, 108 *S.Ct.* at 1634, 100 *L.Ed.*2d at 44 (Brennan, J., dissenting); *see also California v. Rooney,* 483 *U.S.* 307, 320, 107 *S.Ct.* 2852, 2865, 97 *L.Ed.*2d 258, 268 (1987) (White, J., dissenting) (defendant's "property interest [in trash] does not settle the matter for Fourth Amendment purposes, for the reach of the Fourth Amendment is not determined by state property law").

Even if defendants here had unequivocally renounced their proprietary interest in their garbage, their divestment would not determine their privacy interest. "A justified expectation of privacy may exist as to items [that] have been abandoned in the property law sense, just as it is true that no such expectation may exist on some occasions even though the property has not been abandoned." 1 LaFave, *supra,* § 2.6(c), at 477 (2nd

ed. 1987). An example of the latter might be a personal diary loaned to a museum.

Courts using "abandonment" in the property-law sense have also overlooked whether, far from losing their expectation of privacy in discarded possessions, people sometimes throw things out in order to *maintain* their privacy. A more pragmatic Emma Bovary might throw away the love letters from her Monsieur Léon to prevent her husband from discovering them in her rosewood desk.

Justice Garibaldi misses the point here. See *post* at 233, 576 *A.*2d at 819. We are not suggesting that a person's *expectation* of privacy in a letter is as great when it is in the garbage as when it is in the bedroom. We are saying merely that the discard of an item does not necessarily signify an intent to surrender a privacy *interest* in it.

The Appellate Division shifted gears in using "abandonment" in both the constitutional sense and the property-law sense. The court first declared that "there can be no [privacy] expectation in abandoned property":

"In the context of the Fourth Amendment a defendant 'abandons' property when he voluntarily discards, leaves behind or otherwise relinquishes his interest in the property in question so that he can no longer retain a reasonable expectation of privacy with regard to it at the time of the search."

[229 *N.J.Super.* at 560, 552 *A.*2d 212 (quoting *State v. Farinich*, 179 *N.J.Super.* 1, 6, 430 *A.*2d 233 (App.Div.1981), *aff'd*, 89 *N.J.* 378, 446 *A.*2d 120 (1982)).]

That reasoning is circular: a person has no reasonable privacy expectation in abandoned property; property is abandoned when the owner loses any privacy expectation in it. A equals B because B, by definition, equals A. Of course "there can be no [privacy] expectation in abandoned property." *Ibid.*

Matters then became murkier when the Appellate Division used "abandonment" in the property-law sense. It stated that the issue in the instant cases is "whether by abandoning the garbage, [defendants] forfeited or compromised [their privacy] expectation." *Ibid.* The court could not have been using abandonment in the constitutional sense, for if it had, there

would have been no question that the defendants had "forfeited" their privacy expectation by "abandoning the garbage."

■ The concept of "abandonment" in the constitutional sense is not particularly helpful. Article I, paragraph 7 prohibits unreasonable searches in situations in which a person can have a reasonable expectation of privacy. If used to mean relinquishment of a reasonable privacy expectation, the term "abandonment" adds nothing constructive to the analysis. The proposition that one loses the protection of article I, paragraph 7 by "abandoning" property is a truism. Reference to "abandonment" only clouds the issue. The confusion the term engenders suggests that our courts should refrain from using it in search-and-seizure cases.

Questions of "abandonment" and property law do not defeat an expectation of privacy in garbage left on the curb for collection. Unpersuaded by any of the State's arguments that such a privacy expectation is unreasonable, we hold that article I, paragraph 7 protects curbside garbage.

–D–

■ The garbage searched in *Pasanen* was enclosed in gray plastic trash bags. In *Hempele,* the police seized white trash bags that had been placed in a plastic garbage can. If those were ordinary trash bags, they concealed their contents from plain view. A person has as much right to privacy in items concealed in a garbage bag as in items concealed in other opaque containers. Defendants had a reasonable expectation of privacy in the contents of their trash bags and can claim the protection of article I, paragraph 7.

V

■ Having found that article I, paragraph 7 protects garbage left on the curb for collection, we must now determine what is required for valid seizures and searches of garbage.

The requisite cause for the search of effects can differ from the cause needed to seize them. *See, e.g., United States v. Jacobsen, supra,* 466 *U.S.* at 114, 104 *S.Ct.* at 1652, 80 *L.Ed.*2d at 94–95 ("[e]ven when government agents may lawfully seize [a sealed] package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package"). We therefore consider the requisite cause for a seizure and for a search of garbage separately.

–A–

*United States v. Van Leeuwen, supra,* 397 *U.S.* 249, 90 *S.Ct.* 1029, 25 *L.Ed.*2d 282, is particularly instructive for determining the requisite cause for garbage seizures. In that case a postal clerk in Mt. Vernon, Washington, told a police officer that he was suspicious of two packages of coins just mailed. The officer immediately noticed that the return address was for a vacant housing area. He also observed that the mailer's car had Canadian license plates. Authorities held the packages at the post office while they conducted an investigation. They learned that the addressees were both under investigation for trafficking in illegal coins. A search warrant issued. The packages were opened, inspected, resealed, and promptly sent on their way. The defendant was later convicted for illegally importing gold coins. The Ninth Circuit reversed the conviction, holding that the trial court should have suppressed the coins found in the packages because the authorities had not obtained a timely warrant.

The Supreme Court disagreed. It held that the officials had had sufficient suspicion to detain the packages. A warrant was unnecessary because the twenty-nine-hour detention did not violate any interest of the defendant protected by the fourth amendment. "The significant Fourth Amendment interest was in the privacy of this first-class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was

obtained." *Id.* at 253, 90 *S.Ct.* at 1029, 25 *L.Ed.*2d at 286. Far from being "unreasonable," the detention was a "prudent act" enabling customs to confirm its initial suspicions rather than letting the packages enter the mail and then trying to locate them *en route. Ibid.* The Court did not say, however, whether the level of the suspicion shown by the police in that case is necessary to delay the shipment of a package.

The reasoning in *Van Leeuwen* suggests that a warrant based on probable cause should not be necessary before the State can seize trash bags left for collection. Although people have an interest in keeping the contents of their garbage private, their interest does not extend to the location of the garbage. So long as the contents remain private, it does not matter whether the trash bags are in the garbage truck, the landfill, or the police station. The seizure of garbage affects neither privacy nor possessory interests.

In order to seize garbage bags left for collection, the police need not show even the level of suspicion exhibited in *Van Leeuwen.* Mailers have an interest that their packages reach their destination without much delay. People who leave their garbage for collection do not care how long it takes the trash to reach the dump. Because people have no interest in preventing the seizure of trash bags left on the curb for collection, the police do not need cause to seize the bags. The arbitrary seizure of trash bags on the curb violates no interests protected by article I, paragraph 7.

–B–

The New Jersey Constitution "requires the approval of an impartial judicial officer based on probable cause before most searches may be undertaken." *State v. Patino,* 83 *N.J.* 1, 7, 414 *A.*2d 1327 (1980); *State v. Ercolano,* 79 *N.J.* 25, 41–42, 397 *A.*2d 1062 (1979). "Any warrantless search is *prima facie* invalid." *State v. Hill, supra,* 115 *N.J.* at 173, 557 *A.*2d 322. Those principles certainly apply to opaque containers. *See*

*United States v. Jacobsen, supra*, 466 *U.S.* at 120 n. 17, 104 *S.Ct.* at 1660 n. 17, 80 *L.Ed.*2d at 98 n. 17 ("[a] container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant"); *United States v. Ross, supra*, 456 *U.S.* at 811, 102 *S.Ct.* at 2165, 72 *L.Ed.*2d at 585 (noting the "general principle that closed packages and containers may not be searched without a warrant"). The State urges us to add garbage searches to the warrant requirement's "few narrowly circumscribed exceptions," *State v. Patino, supra*, 83 *N.J.* at 7, 414 *A.*2d 1327. *See State v. Hill, supra*, 115 *N.J.* at 173–74, 557 *A.*2d 322.

 Once the protections of article I, paragraph 7 apply, a lower expectation of privacy is not a sufficient basis on which to carve out an exception to the warrant and probable-cause requirement. We can dispense with that requirement "[o]nly in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable * * *." *New Jersey v. T.L.O.*, 469 *U.S.* 325, 351, 105 *S.Ct.* 733, 747, 83 *L.Ed.*2d 720, 741 (1985) (Blackmun, J., concurring in judgment holding that warrants are unsuited for searches of students because "[s]chool officials need to mete out punishment swiftly and informally," 469 *U.S.* at 340, 105 *S.Ct.* at 742, 83 *L.Ed.*2d at 733); *see, e.g., State v. Kirk*, 202 *N.J.Super.* 28, 56, 493 *A.*2d 1271 (App.Div.1985) (temporary roadblock without warrant or probable cause was illegal because no " 'strong considerations of law enforcement and public safety impel[led] a suspension of the normal high value embedded in the constitutions' " (quoting *State v. Ercolano, supra*, 79 *N.J.* at 42, 397 *A.*2d 1062)). If a "special need" does exist, we can then make an exception to the requirement only after we "balance the nature and quality of the intrusion on the individual's [article I, paragraph 7] interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 *U.S.* 696, 703, 103 *S.Ct.* 2637, 2642, 77 *L.Ed.*2d 110, 118 (1983).

Thus, even if garbage searches are only "minimally intrusive" of a person's privacy, *United States v. Place, supra,* 462 *U.S.* at 703, 103 *S.Ct.* at 2642, 77 *L.Ed.*2d at 118, the warrant and probable-cause requirement for garbage searches can be scrapped only if a special government interest significantly outweighs those privacy interests. The State does not identify any such government interest.

The mobility of garbage bags does not justify a lower standard of cause. The issue of mobility, which is part of the justification for the automobile exception, *see State v. Lund, supra,* 119 *N.J.* at 38–39, 573 *A.*2d 1376, does not apply here because the police need no cause to seize a garbage bag. If the police fear that the bag will disappear before they are able to secure a search warrant, they can seize it for the interim. *See United States v. Ross, supra,* 456 *U.S.* at 811, 102 *S.Ct.* at 2165, 72 *L.Ed.*2d at 585 ("the practical problems associated with the temporary detention of a piece of luggage during the period of time necessary to obtain a warrant are significantly less than those associated with the detention of an automobile"); *United States v. Chadwick, supra,* 433 *U.S.* at 13, 97 *S.Ct.* at 2484, 53 *L.Ed.*2d at 349–50 (footlocker's mobility does not justify warrantless search after seizure).

Nor does the alleged pervasiveness of garbage regulations reduce the level of cause necessary for a search. Sometimes the enforcement of government regulations themselves can fulfill the need for a special government interest. If the purpose of the search is to investigate compliance with the regulations, a warrant based on probable cause might not be necessary. *See, e.g., In re Martin,* 90 *N.J.* 295, 314 n. 9, 447 *A.*2d 1290 (1982) ("reasonable" warrantless searches of casino licensees are permissible if they are "conducted in a manner that furthers the regulatory purposes of the Casino Control Act"). That rationale is unavailable here because the purpose of the garbage searches was enforcement of the drug laws, not of garbage regulations. There is no nexus between the garbage-collection regulations and the enforcement of drug laws.

Even if the regulations do lessen the privacy expectation in garbage, no government interest related to the regulations makes the warrant requirement "impracticable." *New Jersey v. T.L.O., supra*, 469 *U.S.* at 351, 105 *S.Ct.* at 747, 83 *L.Ed.*2d at 741 (Blackmun, J., concurring in the judgment).

Recycling regulations are analogous to postal regulations. Federal law limits what a person may send through the mail. See 39 *U.S.C.A.* § 3001. Despite those restrictions, officials still need a warrant to search first-class mail. *United States v. Jacobsen, supra*, 466 *U.S.* at 114, 104 *S.Ct.* at 1657, 80 *L.Ed.*2d at 94. The fact that recycling laws may regulate what people put in their garbage does not enable the police to search it without a warrant.

Nor does the public interest in combatting the drug problem justify an exception to the warrant requirement. The United States Supreme Court dealt with a similar issue in *Mincey v. Arizona*, 437 *U.S.* 385, 98 *S.Ct.* 2408, 57 *L.Ed.*2d 290 (1978). There the State contended that "the vital public interest in the prompt investigation of the extremely serious crime of murder" justified an exception to the warrant requirement for searches of homicide scenes. *Id.* at 393, 98 *S.Ct.* at 2413, 57 *L.Ed.*2d at 300. The Court rejected the argument:

> No one can doubt the importance of this goal. But the public interest in the investigation of other serious crimes is comparable. If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or a burglary?
>
> [*Ibid.*]

The Court added that the public interest in improving the efficiency of law enforcement can "never by itself justify disregard of the Fourth Amendment." *Id.* at 393, 98 *S.Ct.* at 2413, 57 *L.Ed.*2d at 301. Although "[t]he investigation of crime would always be simplified if warrants were unnecessary," the fourth amendment rests on the principle that "the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Ibid.*

The same reasoning applies to garbage searches, drug crimes, and article I, paragraph 7. The public interest in apprehending drug offenders is no greater than the interest in apprehending murderers. Compare *N.J.S.A.* 2C:11–3 (person who purposely or knowingly kills is subject to death sentence) with *N.J.S.A.* 2C:35–5 (distribution of heroin is crime of the first degree) and *N.J.S.A.* 2C:43–6a(1) (punishment for first-degree crime is ten to twenty years in prison). Moreover, although garbage searches may help police apprehend drug offenders, so do house searches. But the usefulness of house searches in the "war on drugs" is not reason to discard the core of article I, paragraph 7: the warrant requirement for house searches. "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Alameida–Sanchez v. United States*, 413 *U.S.* 266, 273, 93 *S.Ct.* 2535, 2539, 37 *L.Ed.*2d 596, 603 (1973).

Because we find no special state interest that makes the warrant requirement impracticable, we hold that the State must secure a warrant based on probable cause in order to search garbage bags left on the curb for collection.

## VI

■■■ The State worries that applying article I, paragraph 7 to garbage searches will "substantially frustrate" enforcement of New Jersey's recycling laws. Although the issue of recycling searches is not directly before us now, we anticipate that our decision today might lead to public concern on that question. The general guidelines suggested below are mere *dicta*, not binding. Should cases involving recycling searches arise, fully-briefed courts are free to consider the issue anew.

Requiring the police to secure a warrant based on probable cause for garbage searches conducted in criminal investigations

does not mean that the same type of proof would be necessary for garbage searches conducted to ensure compliance with recycling laws. The latter might fall under the "administrative inspection" exception applied in *Camara v. Municipal Court,* 387 *U.S.* 523, 87 *S.Ct.* 1727, 18 *L.Ed.*2d 930 (1967). *Camara* dealt with housing-code inspections. Although warrants are necessary for those inspections, "health officials need not show the same kind of proof to a magistrate to obtain a warrant as one must who would search for the fruits or instrumentalities of crime." *Id.* at 538, 87 *S.Ct.* at 1735, 18 *L.Ed.*2d at 940 (quoting *Frank v. Maryland,* 359 *U.S.* 360, 383, 79 *S.Ct.* 804, 817, 3 *L.Ed.*2d 877, 891 (1959) (Douglas, J., dissenting)); *cf. In re Martin, supra,* 90 *N.J.* at 315–16, 447 *A.*2d 1290 (discussing use of administrative warrant under the Casino Control Act).

Probable cause for a warrant to inspect for housing-code violations exists "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* at 538, 87 *S.Ct.* at 1735, 18 *L.Ed.*2d at 941. The standards might include a passage of time between inspections, the nature of the building, and the condition of the area. They do not, however, "necessarily depend upon specific knowledge of the condition of the particular dwelling." *Ibid.*.

The Court in *Camara* set forth three factors that make programs for area housing-code inspections reasonable. First, "such programs have a long history of judicial and public acceptance." 387 *U.S.* at 537, 87 *S.Ct.* at 1735, 18 *L.Ed.*2d at 940. Second, it is "doubtful" that other techniques could achieve the strong public interest of ensuring compliance with housing codes. *Ibid.* Third, "because the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of the urban citizen's privacy." *Ibid.*

To varying degrees those considerations apply to recycling. Although recycling inspection programs do not have a "long"

history, area inspections of garbage may be the only effective way of enforcing recycling ordinances. Furthermore, recycling inspections need not be so intrusive as criminal garbage searches. A quick look into a trash bag will confirm whether the recycling ordinances are being obeyed. Combing through every item in the bag and conducting laboratory tests, practices often involved in garbage searches during criminal investigations, would be unnecessary. Thus although authorities might need warrants to conduct recycling searches, they might not need specific information indicating that a particular resident is violating the regulations.

## VII

In summary, article I, paragraph 7 applies to the search but not to the seizure of a garbage bag left on the curb for collection. Law-enforcement officials need no cause to seize the bag, but they must have a warrant based on probable cause to search it. Because the trial court in *Pasanen* held only that the State had had reasonable suspicion, we remand that case to the trial court to determine whether there was probable cause for the garbage searches and whether exigent circumstances justified the failure to have secured warrants. Although the grounds for the trial court's suppression order in *Hempele* were erroneous, the court did hold that the State needed a warrant based on probable cause to search the garbage. Implicit in its ruling was a finding that no exigent circumstances had justified dispensing with the warrant requirement. We therefore uphold the suppression order.

Our decision today does not follow the course set by the Supreme Court because "we are persuaded that the equities so strongly favor protection of a person's privacy interest that we should apply our own standard rather than defer to the federal provision." *State v. Hunt, supra,* 91 *N.J.* at 344–45, 450 *A.*2d 952. We are aware that our ruling conflicts not only with *California v. Greenwood, supra,* 486 *U.S.* 35, 108 *S.Ct.* 1625,

100 *L.Ed.*2d 30, but also with the holdings of virtually every other court that has considered this issue. *See, e.g., United States v. Dela Espriella,* 781 *F.*2d 1432, 1437 (9th Cir.1986); *United States v. Michaels,* 726 *F.*2d 1307, 1312–13 (8th Cir.), *cert. denied,* 469 *U.S.* 820, 105 *S.Ct.* 92, 83 *L.Ed.*2d 38 (1984); *United States v. Kramer, supra,* 711 *F.*2d at 791–94; *United States v. Terry,* 702 *F.*2d 299, 308–09 (2nd Cir.), *cert. denied,* 461 *U.S.* 931, 103 *S.Ct.* 2095, 77 *L.Ed.*2d 304 (1983); *United States v. Reicherter, supra,* 647 *F.*2d at 399; *United States v. Vahalik, supra,* 606 *F.*2d at 100–01; *United States v. Crowell,* 586 *F.*2d 1020, 1024–25 (4th Cir.1978), *cert. denied,* 440 *U.S.* 959, 99 *S.Ct.* 1500, 59 *L.Ed.*2d 772 (1979); *Magda v. Benson,* 536 *F.*2d 111, 112–13 (6th Cir.1976); *United States v. Mustone,* 469 *F.*2d 970, 972–73 (1st Cir.1972); *Walls v. State,* 536 *So.*2d 137, 139 (Ala.Crim.App.1988), *cert. denied,* —— *U.S.* ——, 109 *S.Ct.* 1744, 104 *L.Ed.*2d 181 (1989); *Smith v. State, supra,* 510 *P.*2d 793; *State v. Fassler,* 108 *Ariz.* 586, 591–93, 503 *P.*2d 807, 813–14 (1972); *State v. Schultz, supra,* 388 *So.*2d at 1327– 29; *People v. Huddleston,* 38 *Ill.App.*3d 277, 280–81, 347 *N.E.*2d 76, 78–81 (1976); *State v. Henderson,* 435 *N.W.*2d 394, 395–97 (Iowa Ct.App.1988); *State v. Kyles,* 513 *So.*2d 265, 269– 70 (La.1987), *cert. denied,* 486 *U.S.* 1027, 108 *S.Ct.* 2005, 100 *L.Ed.*2d 236 (1988); *Commonwealth v. Pratt,* 407 *Mass.* 647, 660, 555 *N.E.*2d 559, 567 (1990); *People v. Thivierge,* 174 *Mich.App.* 258, 261, 435 *N.W.*2d 446, 447 (1988), *appeal denied,* (1989); *State v. Oquist, supra,* 327 *N.W.*2d at 589–91; *State v. Trahan, supra,* 229 *Neb.* at 686–91, 428 *N.W.*2d at 622–24; *State v. Brown,* 20 *Ohio App.*3d 36, 37–38, 484 *N.E.*2d 215, 217–18 (1984); *Cooks v. State,* 699 *P.*2d 653, 656 (Okla.Crim. App.), *cert. denied,* 474 *U.S.* 935, 106 *S.Ct.* 268, 88 *L.Ed.*2d 275 (1985); *Commonwealth v. Minton,* 288 *Pa.Super.* 381, 391, 432 *A.*2d 212, 217 (1981); *State v. Boland,* 55 *Wash.App.* 657, 781 *P.*2d 490 (1989), *review granted,* 113 *Wash.*2d 1035, 785 *P.*2d 828 (1990); *State v. Stevens,* 123 *Wis.*2d 303, 315–21, 367 *N.W.*2d 788, 795–97, *cert. denied,* 474 *U.S.* 852, 106 *S.Ct.* 151, 88 *L.Ed.*2d 125 (1985); *Croker v. State,* 477 *P.*2d 122, 125–

26 (Wyo.1970). To the extent that they discuss their reasoning, those decisions rely on some permutation of the five arguments we have rejected here. Although the weight of the cited authority is impressive, our thorough consideration of the issue leads us to record our respectful disagreement with those courts that have reached a result contrary to ours.

We do concur, however, in the observation that there is no "unique New Jersey state attitude about garbage." *Post* at 234, 576 *A.*2d at 819 (Garibaldi, J., dissenting). Our differences with the cited authority rest on other grounds. As the trial court in *Pasanen* so eloquently put it, "the trouble with those cases is that they are flatly and simply wrong as the matter of the way people think about garbage." Garbage can reveal much that is personal. We do not find it unreasonable for people to want their garbage to remain private and to expect that it will remain private from the meddling of the State.

Article I, paragraph 7 confers "as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States,* 277 *U.S.* 438, 478, 48 *S.Ct.* 564, 572, 72 *L.Ed.* 944, 956 (1927) (Brandeis, J., dissenting). Permitting the police to pick and poke their way through garbage bags to peruse without cause the vestiges of a person's most private affairs would be repugnant to that ideal. A free and civilized society should comport itself with more decency.

We affirm the judgment of the Appellate Division in *Hempele,* reverse in *Pasanen,* and remand the causes to the Law Division for further proceedings consistent with this opinion.

O'HERN, J., concurring in part and dissenting in part.

This case is not about garbage. This case is about the values of federalism. Were I a member of the United States Supreme Court, I might well have voted differently from the majority in *California v. Greenwood,* 486 *U.S.* 35, 108 *S.Ct.* 1625, 100

*L.Ed.*2d 30 (1988). Justice Clifford's painstaking analysis of the issues is quite persuasive and it convincingly demonstrates that the United States Supreme Court may have drawn the line a bit too far in that case.

But that is not the real issue in this case. The issue is the basis on which we shall depart from Supreme Court precedent in interpreting counterpart guarantees of our Constitution. On that score, I quite agree with Justice Garibaldi that this case falls convincingly short of standards that the Court has been developing. *See State v. Novembrino,* 105 *N.J.* 95, 519 *A.*2d 820 (1987) (New Jersey has different prosecutorial policy and standards governing issuance of judicial search warrants); *State v. Hunt,* 91 *N.J.* 338, 450 *A.*2d 952 (1982) (New Jersey has broadened protections regarding confidentiality of telephone conversations).

For me, it is not enough to say that because we disagree with a majority opinion of the Supreme Court, we should invoke our State Constitution to achieve a contrary result. It sounds plausible, but one of the unanticipated consequences of that supposedly benign doctrine of state-constitutional rights is an inevitable shadowing of the moral authority of the United States Supreme Court. Throughout our history, we have maintained a resolute trust in that Court as the guardian of our liberties.

The most distinct aspect of our free society under law is that all acts of government are subject to judicial review. Whether we have agreed with the Supreme Court or not, we have cherished most its right to make those judgments. In no other society does the principle of judicial review have the moral authority that it has here. Where else would a court order its nation's head of State to submit to the regular processes of law? See *United States v. Nixon,* 418 *U.S.* 683, 94 *S.Ct.* 3090, 41 *L.Ed.*2d 1039 (1974). Where else would a court order a president during wartime to divest himself of steel mills? See *Youngstown Sheet & Tube Co. v. Sawyer,* 343 *U.S.* 579, 72

*S.Ct.* 863, 96 *L.Ed.* 1153 (1952). Where else would a court order a governor to stand aside despite that governor's own understanding of constitutional doctrine? See *Cooper v. Aaron*, 358 *U.S.* 1, 78 *S.Ct.* 1401, 3 *L.Ed.*2d 5 (1958).

Of course the Supreme Court has blinked on occasion in its long history. Not many can be proud today of the way Japanese Americans were treated during World War II. See *Korematsu v. United States*, 323 *U.S.* 214, 65 *S.Ct.* 193, 89 *L.Ed.* 194 (1944). There are such occasions in our history when only enormous reservoirs of public trust would have enabled the Court to sail against the winds of popular disapproval.

The great moral disasters of the twentieth century in Germany, Russia, Cambodia, and Argentina all occurred in societies in which there was no genuine rule of law, no appeal of last resort, no guarantee of liberties. Trials, if there were any, were but propaganda tools of the State.

Respect for law flows from a belief in its objectivity. To the extent possible, we ought not personalize constitutional doctrine. When we do otherwise, we vindicate the worst fears of the critics of judicial activism. The fourth amendment is the fourth amendment. It ought not mean one thing in Trenton and another across the Delaware River in Morrisville, Pennsylvania.

In truth, the constitutional vision that we have shared as a people is not one of state-constitutional guarantees of freedom. Whether God-given or the result of social compact, the content of our freedom under law is drawn from the Bill of Rights. I rather doubt that most Americans think otherwise. One need only recall that it was the Supreme Court, not state courts, that guaranteed freedom of religion, see *Meyer v. Nebraska*, 262 *U.S.* 390, 43 *S.Ct.* 625, 67 *L.Ed.* 1042 (1923); the right to counsel, see *Powell v. Alabama*, 287 *U.S.* 45, 53 *S.Ct.* 55, 77 *L.Ed.* 158 (1932); freedom of speech, see *Near v. Minnesota*, 283 *U.S.* 697, 51 *S.Ct.* 625, 75 *L.Ed.* 1357 (1931); or that one person would have one vote, see *Baker v. Carr*, 369 *U.S.* 186,

82 *S.Ct.* 691, 7 *L.Ed.*2d 663 (1962). For good or ill, this unique American vision of freedom has been nurtured by the United States Supreme Court. There may come a time when the Supreme Court might abdicate its responsibility and we would have to act, but this is surely not it. Where that Court has drawn the line in this case does not significantly endanger our freedoms. I would abide by its judgment. If there is a New Jersey view on this issue, the Legislature can vindicate it in time.

We do not cease being judges when we accept doctrines with which we disagree. After all, every week and every day we apply precedents against which we may have voted. It may be that a reasoned debate will produce the intended change in doctrine. In the Sixties this Court was particularly outspoken in its criticism of where the Supreme Court drew the line on the Bill of Rights. See *State v. Forcella*, 52 *N.J.* 263, 245 *A.*2d 181 (1968), *rev'd in part, Funicello v. New Jersey*, 403 *U.S.* 948, 91 *S.Ct.* 2278, 29 *L.Ed.*2d 859 (1971). Some lines were redrawn. This line may be redrawn. For now, the Supreme Court has drawn a line as it must often do. Whether it be at a phone booth, on an open field, or in a school locker, the lines drawn will always require some measure of discretion.

Like most Americans, I don't like people snooping around in my garbage and I doubt that most police officers will want to do that. But we certainly need more reason than this to discard the vision of one nation under law.

The Appellate Division made a measured disposition of the issues that fairly took into account the state and federal interests. It would have recognized a limited privacy interest in discarded materials and balanced that with a requirement for reasonably based police action. That disposition would serve our state needs. I would affirm both of its dispositions.

GARIBALDI, J., dissenting.

In *California v. Greenwood*, 486 *U.S.* 35, 108 *S.Ct.* 1625, 100 *L.Ed.*2d 30 (1988), the Supreme Court held that the fourth

amendment does not prohibit the warrantless search and seizure of garbage left for collection outside a home. It concluded that society does not accept as reasonable a person's claim to an expectation of privacy in trash left for collection in an area readily accessible to the public. The majority recognizes that the garbage searches and seizures in both cases are valid under the fourth amendment, but holds that under the New Jersey Constitution, New Jersey citizens have a different expectation of privacy in their garbage from that of citizens under the federal constitution. I disagree.

I would not depart from federal-constitutional law for two reasons. First under principles of federalism, there is no sound public policy that would justify such a departure. Secondly, in my view, federal law better comports with the reasonable expectation of privacy that most New Jersey citizens have for their discarded garbage placed on the street for collection.

I

Although it is undisputed that the New Jersey Constitution may provide greater protection to individual rights than the federal constitution, "it is equally settled that such enhanced protection should be extended only when justified by 'sound policy reasons.'" *State v. Stever,* 107 *N.J.* 543, 557, 527 *A.*2d 408, (quoting *State v. Hunt,* 91 *N.J.* 338, 345, 450 *A.*2d 952 (1982); *State v. Williams,* 93 *N.J.* 39, 59, 459 *A.*2d 641 (1983)) .*cert. denied,* 484 *U.S.* 954, 108 *S.Ct.* 348, 98 *L.Ed.*2d 373 (1987); *see also Right to Choose v. Byrne,* 91 *N.J.* 287, 301, 450 *A.*2d 925 (1982) ("We proceed cautiously before declaring rights under our state Constitution that differ significantly from those enumerated by the United States Supreme Court in its interpretation of the federal Constitution.").

It is essential that a
considerable measure of cooperation [ ] exist in a truly effective federalist system. Both federal and state courts share the goal of working for the good of the people to ensure order and freedom under what is publicly perceived as a single system of law.

[*State v. Hunt, supra,* 91 *N.J.* at 363, 450 *A.*2d 952 (Handler, J., concurring).]

We have declared that "[d]ivergent interpretations are unsatisfactory from the public perspective, particularly where the historical roots and purposes of the federal and state provisions are the same." *Id.* at 345, 450 *A.*2d 952. A citizen becomes confused when he or she finds that under virtually identical constitutional provisions, it is permissible for a federal agent, but not a New Jersey law-enforcement officer, to search his or her garbage. Such distinctions between federal and state constitutions are difficult for a citizen to fathom. In my view, garbage does not change its constitutional dimensions based on who searches the garbage in a particular location. Different treatment of such an ordinary commodity appears illogical to the public and hence breeds a fundamental distrust of the legal system that develops such distinctions.

An examination of the "divergence criteria" developed in *State v. Hunt, supra,* 91 *N.J.* at 364–68, 450 *A.*2d 952 (Handler, J., concurring) and reaffirmed in *State v. Williams, supra,* 93 *N.J.* at 59, 459 *A.*2d 641, indicates that there are no independent state-constitutional grounds to justify our divergence from federal law in this area. The textual language, phrasing, and structures of the fourth amendment and article I, paragraph 7 are virtually identical. There is no state statute on this issue and hence no legislative history that would support interpreting the provision independently of federal law. Unlike those cases in which we have departed from federal search-and-seizure jurisprudence, *see, e.g., State v. Novembrino,* 105 *N.J.* 95, 519 *A.*2d 820 (1987) (rejecting good-faith exception to exclusionary rule); *State v. Hunt, supra,* 91 *N.J.* at 338, 450 *A.*2d 952 (finding privacy right in telephone-toll-billing records), the most analogous pre-existing state law supports uniform interpretation. For example, in *State v. Farinich,* 179 *N.J.Super.* 1, 430 *A.*2d 233 (App.Div.1981), *aff'd,* 89 *N.J.* 378, 446 *A.*2d 120 (1982), the defendants, having been approached by police at the airport, dropped their suitcases and fled. Finding that the defendants had voluntarily abandoned their property, the court rea-

soned that defendants could "no longer retain a reasonable expectation of privacy ... [in their suitcases] at the time of the search." 179 *N.J.Super.* at 6, 430 *A.*2d 233. Although disputing the majority's conclusion factually that the defendants had "abandoned" their suitcases, the dissent agreed that a defendant maintains no expectation of privacy in discarded property when an "intent to part with possession is unmistakably shown." *Id.* at 8, 430 *A.*2d 233 (Antell, J., dissenting). *See also State v. Burgos,* 185 *N.J.Super.* 424, 425, 449 *A.*2d 536 (App.Div.1982) (defendant had no protectible privacy interest in aspirin tin that he hid under car on public street).

Nor do I find that discarded garbage is a matter of particular state interest that affords an appropriate basis for resolving this issue on independent state grounds. New Jersey garbage is not unique, nor is there any reason to suppose that New Jersey citizens have a greater expectation of privacy in their trash than do citizens of most other states.

## II

I also dissent from the majority because I think that federal law better reflects the "expectations of privacy" that New Jersey citizens have in their discarded trash.

I find it difficult to understand how the majority adopts an objective standard of reasonable expectations, starting from the "premise that 'expectations of privacy are established by general social norms,'" *supra,* at 200–201, 576 *A.*2d at 802–803 (quoting *Robbins v. California,* 453 *U.S.* 420, 428, 101 *S.Ct.* 2841, 2847, 69 *L.Ed.*2d 744, 751 (1981) (plurality opinion), *overruled on other grounds, United States v. Ross,* 456 *U.S.* 798, 102 *S.Ct.* 2157, 72 *L.Ed.*2d 572 (1982)), yet reaches a conclusion that "conflicts not only with *California v. Greenwood, supra,* ... but also with the holdings of virtually every other court that has considered the issue." *Ante* at 224, 576 *A.*2d at 814 (citations omitted). The existence of such overwhelming au-

thority undermines the majority's position that society has a reasonable expectation of privacy in garbage left on the curb.

The Third Circuit Court of Appeals has succinctly stated the underlying rationale for the widely-embraced theory:

> Defendant claims that ... he had a reasonable expectation of privacy in the trash he placed in a public area to be picked up by trash collectors.... A mere recitation of the contention carries with it its own refutation.
>
> \* \* \* \* \* \* \* \*
>
> Having placed the trash in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it, it is inconceivable that the defendant intended to retain a privacy interest in the discarded objects.
>
> [*United States v. Reicherter*, 647 *F*.2d 397, 399 (1981).]

Similarly, in *United States v. Shelby*, 573 *F*.2d 971, 973–74 (7th Cir.1978), the court explained:

> In the real world to so view the status of one's discarded trash is totally unrealistic, unreasonable, and in complete disregard of the mechanics of its disposal. In our view the placing of trash in the garbage cans at the time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment.... The contents of the cans could not reasonably be expected by defendant to be secure, nor entitled to respectful, confidential and careful handling on the way to the dump. Trash generally is not so highly regarded....
>
> It is common knowledge, at times due to the unfortunate circumstances of some persons or even just for curiosity or mischief, that others may disturb one's trash. The defendant admitted that this had happened on occasion but argues that it is irrelevant. We believe it should at least have served to remind the defendant of the unreliability of any thought of privacy he may have had about his trash. It therefore seems to be more prudent to put only genuine trash, not secrets, in garbage cans[.]
>
> [Footnotes omitted.]

I do not believe that the people of New Jersey objectively regard their trash any differently from the way most citizens in the United States do. Most people have little interest in their garbage once they have placed it on the street for pick-up. They have left it there because they wish to be rid of it. They do not expect to see their garbage again and do not care when or how it will be disposed of by the municipal garbage collector. A search of a person's discarded garbage presents no intrusive invasion of that person's rights, whether the garbage is inspect-

ed by municipal officials for recycling violations, law enforcement officers for criminal violations, or by any other member of the general public.

It is common knowledge that curb-side garbage is readily accessible to the public. Most people know that their garbage will be seen at some point by a third person, at the very least by the local garbage collector. Most people are aware that garbage sitting on public streets is readily accessible to "animals, children, scavengers, snoops and other members of the public." *California v. Greenwood, supra,* 486 *U.S.* at 40, 108 *S.Ct.* at 1628–29, 100 *L.Ed.*2d at 36–37. The homeless often rummage through garbage for food and other items. *Id.* at 40, nn. 3 & 4, 108 *S.Ct.* at 1629, nn. 3 & 4, 100 *L.Ed.*2d at 36–37, nn. 3 & 4. Although most people would undoubtedly prefer that others leave their garbage alone, this is less, I suspect, for privacy reasons, than for the inconvenience of having the contents of their garbage strewn on the sidewalk in front of their residence.

The majority's position that a person's expectation of privacy in a letter he or she throws into the garbage is as great as the expectation of privacy in a letter kept in a bedroom, *ante* at 214, 576 *A.*2d at 809, defies common sense. It is the action a person takes in preserving an item as private, not the nature of the item, that determines a person's expectation of privacy. I would hope that a person's expectation of privacy in a letter under lock and key in a safe deposit box is much greater than the expectation of privacy in a letter thrown in the garbage.

Likewise, I find little merit to the majority's comparison between a letter placed in a mail box and trash put on the street. *Ante* at 206, 576 *A.*2d at 805. Most people, I believe, have a greater expectation of privacy in their mail than in their garbage. The Court correctly recognizes that when a person sends a letter, he or she expects that it will be opened only by the addressee. It ignores, however, that when a person puts

the trash out, he or she expects that it will be seen, examined, or perhaps even repossessed by third parties.

In sum, I am unable to discern a unique New Jersey state attitude about garbage. The inherent nature of garbage and its method of disposal diminishes any expectation of privacy. Nor do I find that the amount of freedom guaranteed to New Jersey citizens under our state constitution will be so diminished as to be inconsistent with the aims of a free and open society if police are allowed to search garbage placed on the curb for pick-up before it is carried to the dump.

Hence, I would find that the garbage searches are valid under both the federal and state constitutions.

*For affirmance, reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and STEIN—5.

*Concurring in part; dissenting in part*—Justice O'HERN—1.

*Dissenting*—Justice GARIBALDI—1.