## State of Vermont v. Richard Morris

[680 A.2d 90]

No. 94-299

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed March 22, 1996

*Jeffrey L. Amestoy*, Attorney General, and *Karen R. Carroll*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Robert Appel*, Defender General, and *Henry Hinton*, Appellate Defender, Montpelier, for Defendant-Appellant.

■ **Johnson, J.** Today, we hold that the Vermont Constitution protects persons from warrantless police searches into the contents of secured opaque trash bags left at curbside for garbage collection and disposal. In our view, because persons have an objectively reasonable privacy interest in the contents of such containers, police must obtain a warrant before searching through them. In this case, absent the evidence obtained from the unlawful search of defendant's trash, the warrant permitting the search of his house was not supported by probable cause; accordingly, we reverse defendant's conviction for possession of marijuana.

## I.

Sometime before March 1993, a confidential informant told an officer of the Brattleboro Police Department that defendant was selling marijuana from his apartment and from the parking lot of a certain grocery store. On March 1, 1993, a regularly scheduled trash collection day, two police officers went to the apartment building where defendant resided and seized the five or six opaque trash bags that had been set out for collection near the curb about five or six feet from the building. From the exterior of the bags, there was no way to identify which tenant had deposited which bags. All of the bags were transported to the police station and searched without a warrant. Inside defendant's bags, which were identified through discarded pieces of mail, the police found marijuana seeds and stems and baggies containing flakes of marijuana.

Based on the items found in the trash, the information supplied by the confidential informant, and an unidentified neighbor's report that defendant had received many different visitors during the past month, the police sought and obtained a warrant to search defendant's residence. Approximately four ounces of marijuana were found, and defendant was charged with possession of marijuana. Defendant moved to suppress all evidence seized from his apartment on the ground that the search warrant was defective because it was based primarily on evidence discovered during an illegal warrantless search of his garbage. The district court denied defendant's motion to suppress, ruling that defendant had no expectation of privacy in his discarded garbage.

On appeal, following his conviction based upon a conditional plea of no contest, defendant argues that the Vermont Constitution prohibits the warrantless search of opaque trash bags placed at curbside for collection on a regularly scheduled trash pick-up day. In response, the

State contends that the Vermont Constitution does not prohibit the warrantless search of curbside trash, and that even if it did and evidence found in defendant's trash bags was suppressed, the other information in the warrant application and affidavit is sufficient to support a finding of probable cause to search defendant's apartment.

## II.

 Our task is to discover and protect the core value of privacy embraced by Chapter I, Article 11 of the Vermont Constitution.[1] *State v. Savva*, 159 Vt. 75, 85, 616 A.2d 774, 779 (1991); *State v. Kirchoff*, 156 Vt. 1, 6-7, 587 A.2d 988, 992 (1991). Article 11 protects persons "from unreasonable, warrantless governmental intrusions into affairs which they choose to keep private." *State v. Zaccaro*, 154 Vt. 83, 91, 574 A.2d 1256, 1261 (1990). The first and foremost line of protection is the warrant requirement. Requiring advance judicial approval before subjecting persons to police searches represents a balance in which an individual's privacy interest outweighs the burdens on law enforcement in obtaining a warrant. *Savva*, 159 Vt. at 85-86, 616 A.2d at 780. Thus, absent exceptional circumstances, the government's decision to invade a person's privacy must be made by a neutral judicial officer rather than the police. *Id.* at 85, 616 A.2d at 779.

 Of course, Article 11 does not "protect areas or activities that have been willingly exposed to the public." *Kirchoff*, 156 Vt. at 7, 587 A.2d at 993. In determining whether persons have a privacy interest in any given area or activity, we examine both private subjective expectations and general social norms. *State v. Blow*, 157 Vt. 513, 517-18, 602 A.2d 552, 555 (1991). The manifested privacy interest must be a reasonable one, but as we have cautioned before, constitutional rights are not limited by waning expectations of privacy resulting from increased governmental intrusion into people's lives. See *Kirchoff*, 156 Vt. at 12, 587 A.2d at 995-96. Ultimately, the question is "'whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by . constitutional

---

[1] Chapter I, Article 11 of the Vermont Constitution provides:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

constraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society.'" 1 W. LaFave, Search and Seizure § 2.6(c), at 592 (3d ed. 1996) (quoting A. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 403 (1974)).

Given the facts of this case, we believe that defendant manifested a privacy interest recognized by society, and we conclude that unconstrained government inspection of people's trash is not consistent with a free and open society. As Justice Brennan stated in his dissent in *California v. Greenwood*, 486 U.S. 35 (1988), "Scrutiny of another's trash is contrary to commonly accepted notions of civilized behavior." *Id.* at 45 (Brennan, J., dissenting). While at first blush there may be a tendency to accept the notion that a person has no reasonable privacy interest in discarded trash, that attraction vanishes when one contemplates the "prospect of police officers, without any cause whatever, opening a securely tied and opaque trash bag, the contents of which are hidden from public view, and then searching the bag to determine the activities, behavior, habits, and lifestyles of persons who deposited the trash in front of their home for disposition by a trash collector." *People v. Hillman*, 834 P.2d 1271, 1278 (Colo. 1992) (Quinn, J., dissenting).

Because "almost every human activity ultimately manifests itself in waste products," it is understandable that persons would want to maintain privacy in the contents of their refuse. *Smith v. State*, 510 P.2d 793, 798 (Alaska 1973). An individual's trash will often reveal intimate details of that person's financial obligations, medical concerns, personal relationships, political associations, religious beliefs, and numerous other confidential matters. See *State v. Tanaka*, 701 P.2d 1274, 1276-77 (Haw. 1985) ("Business records, bills, correspondence, magazines, tax records, and other telltale refuse can reveal much about a person's activities, associations, and beliefs."); see also *People v. Edwards*, 458 P.2d 713, 718 (Cal. 1969) (half truths leading to rumor and gossip may readily flow from attempt to "read" contents of another's trash). As Justice Brennan so cogently stated in his *Greenwood* dissent:

> A search of trash, like a search of the bedroom, can relate intimate details about sexual practices, health, and personal hygiene. Like rifling through desk drawers or intercepting phone calls, rummaging through trash can divulge the target's financial and professional status, political affiliations and inclinations, private thoughts, personal relationships,

and romantic interests. It cannot be doubted that a sealed trash bag harbors telling evidence of the "intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" which the Fourth Amendment is designed to protect.

486 U.S. at 50 (Brennan, J., dissenting) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Given the intimate details of people's lives that may be revealed by searching through their refuse, we conclude that persons have a reasonable interest in keeping private the contents of their sealed trash containers. See *State v. Hempele*, 576 A.2d 793, 803 (N.J. 1990) (undoubtedly, most people would be upset to see another person sifting through their garbage, perusing their discarded mail, reading their bank statements, looking at their empty pharmaceutical bottles, and checking receipts to see what videotapes they rent).

Further, that privacy interest is not lost merely because people follow the customary practice of depositing their garbage in closed containers at curbside for collection and disposal. First, the placement of trash in closed, opaque bags manifests an intent that the contents of the bags not be subjected to examination by the public in general or the police in particular. The State's point that opaque bags are used merely because they are the most common type of bag available only reinforces our point that most people would prefer the type of bag that will keep their trash private until it is commingled with other trash and loses its identity. See Note, *California v. Greenwood: A Proposed Compromise to the Exploitation of the Objective Expectation of Privacy*, 38 Buff. L. Rev. 647, 663 (1990) (nearly exclusive availability of opaque trash bags is result of consumers' desire for privacy). There is a privacy interest in opaque trash bags just as there is in any other closed container whose contents are not in plain view. See *Savva*, 159 Vt. at 89-90, 616 A.2d at 782 ("unworthy container" doctrine rejected; privacy interest exists in closed containers, regardless of their worth).

Second, by placing trash bags at curbside for collection and disposal, one does not evince an intent to allow unregulated governmental intrusion into private materials that one chooses to discard. As a practical matter, the regulated collection of garbage is necessary for the proper functioning of our complex society. Most people today have little choice but to place their garbage at curbside for collection by public or private trash haulers. Note, *supra*, at 662-63 (tracing evolution of American trash collection practices). It is often unrea-

sonably burdensome or unlawful to privately burn or bury unwanted refuse[2]; thus, people must necessarily rely upon governmental or commercial trash collection systems to achieve anonymous disposal of garbage. *Moran v. State*, 644 N.E.2d 536, 543 (Ind. 1994) (Dickson, J., concurring and dissenting) (in today's society, it is no longer reasonable or, in many situations, lawful to burn or bury unwanted waste privately); *Hempele*, 576 A.2d at 808 (state and municipal regulations prevent people from privately burning or burying their garbage). The disposal of opaque garbage bags in the customary way by placing them at curbside for pickup cannot be the basis for concluding that the person no longer has a justified interest or expectation in retaining privacy in the contents of those bags.[3]

---

[2] In Vermont, both state air quality and solid waste regulations restrict residents' options for disposal of trash. 7 Code of Vermont Rules, Agency of Natural Resources, Air Pollution Control Division 5-201(1) (no person shall engage in open burning except in conformity with 5-202) and 5-202(7)(d) (permit may be obtained for open burning of combustible materials for which there is no other feasible method of disposal); *id.*, Solid Waste, 6-302(a) (prohibiting open burning of solid waste except untreated wood) and 6-302(c) (prohibiting disposal of solid waste outside certified facility). The Town of Brattleboro makes it unlawful for persons to dispose of solid waste on private property without the owner's consent or on their own property except in a receptacle designated for collection and disposal by curbside pickup. See Town of Brattleboro, Ordinance Regulating the Collection and Disposal of Solid Waste (April 20, 1993), Article VII, (1) and (2). The Town of Brattleboro also prohibits the burning of any solid waste by open fire or incineration, except for the open burning of natural wood by permit. *Id.* Article IX.

[3] The dissent states that persons who want to keep their discarded papers private may either move to a residence where garbage can be placed outside within the curtilage or take the papers to the dump and dispose of them themselves. The first suggested option makes the incredible assumption that all persons could afford a single-family home with sufficient curtilage to protect their privacy interests. Like the majority in *California v. Greenwood*, 486 U.S. 35 (1988), the dissent assumes that the reasonableness of one's expectation of privacy decreases as the garbage is placed farther from the curtilage of the home, or as the number of residents using a communal receptacle increases. Under this reasoning, persons living in single-family dwellings have a higher expectation of privacy in garbage left next to the house for pickup than do apartment dwellers leaving trash in a communal curbside receptacle because their refuse is in a location less accessible to scavengers and snoops. See *United States v. Hedrick*, 922 F.2d 396, 400 (7th Cir. 1991) (proper focus under *Greenwood* is whether garbage was readily accessible to public); *People v. Whotte*, 317 N.W.2d 266, 268 (Mich. Ct. App. 1982) (at one end of continuum is trash located close to single-family dwelling, and at other end of continuum is trash located off premises of multiple-unit dwelling). While most probably there is a greater risk that the garbage bags of those using curbside service, particularly apartment dwellers using communal receptacles, will be disturbed by unwanted meddlers, this is hardly a sound reason for concluding, in effect, that the police have carte blanche to subject to detailed scrutiny anyone's trash that has been conveniently placed in such a location for pickup. Many people live in apartments because they cannot afford to own their own homes. Making the protection of Article

Notwithstanding the possibility that their garbage will be tampered with by scavengers or snoops, people reasonably expect that, once their refuse is placed on the curb in the customary and accepted manner, it will be collected, taken to the landfill, and commingled with other garbage without being intercepted and examined by the police. The Vermont Constitution does not require the residents of this state to employ extraordinary or unlawful means to keep government authorities from examining discarded private effects.[4] Cf. 1 W. LaFave, *supra*, § 2.6(c), at 593 ("It would be a perversion of *Katz* [389 U.S. 347 (1967)] to interpret it as extending [Fourth Amendment] protection only to those who resort to extraordinary means to keep information regarding their personal lives out of the hands of the police."); *State v. DeFusco*, 620 A.2d 746, 757 (Conn. 1993) (Katz, J., dissenting) ("How many of us, as Connecticut residents, feel the need to shred or destroy personal information before discarding it in order to protect its confidentiality?").

Persons should not be denied protection from unregulated police intrusion into their affairs merely because they are discarding rather than transporting their private effects. Cf. *Greenwood*, 486 U.S. at 49 (Brennan, J., dissenting). Although a person placing trash at curbside for collection and disposal undoubtedly relinquishes a proprietary interest in the trash, it does not necessarily follow that the person intends to renounce a privacy interest in it. See *Hempele*, 576 A.2d at 809 (far from relinquishing their expectation in discarded items, people sometimes throw things out in order to maintain their privacy). "A justified expectation of privacy may exist as to items

---

11 contingent on factors that hinge on a person's financial status is unacceptable. "[A] resident's expectation that the police will not be scavenging through his or her garbage . . . remains the same, whether the dweller resides in a split-level ranch home in the suburbs or in a crowded tenement in the inner city." *Smith v. State*, 510 P.2d 793, 805 (Alaska 1973) (Rabinowitz, C.J., dissenting); see *People v. Smith*, 125 Cal. Rptr. 192, 197 (Ct. App. 1975) (while users of communal receptacles undoubtedly recognize that other tenants might discover contents of their garbage, they have no more reason than single-family residents to expect their trash to be examined by police officers), *vacated by* 553 P.2d 557 (Cal. 1976).

The dissent's second suggested option also ignores the difficulties that the elderly or infirm might have in making a trip to the dump to discard private papers. Further, assuming that such an option is possible in all communities in this state, a fact not contained in the record or otherwise known to us, the people of this state should not have to take extraordinary measures to assure that authorities will be prevented from searching through private papers and effects that they choose to discard in the normal and customary manner of our modern society.

[4] Under *Greenwood* and its progeny, even shredding papers will not ensure protection from the government's reach. See *United States v. Scott*, 975 F.2d 927, 930 (1st Cir. 1992) (no privacy interest in shredded documents placed in trash).

which have been abandoned in the property law sense, just as it is true that no such expectation may exist on some occasions even though the property has not been abandoned." 1 W. LaFave, *supra*, § 2.6(c), at 591-92. Thus, the question is not whether the person abandoned the garbage itself but rather whether the person relinquished an expectation of privacy in the garbage. See *State v. Kerr*, 143 Vt. 597, 609, 470 A.2d 670, 676 (1983) (in search or seizure cases, abandonment relates to expectation of privacy in property rather than to property itself in sense of law of personal property). Our focus must be on the objective reasonableness of one's privacy interest, not one's proprietary interest, in curbside garbage.

This focus is consistent with our prior case law on Article 11, in which we have emphasized that the core value of privacy is the quintessence of Article 11, and that we must determine in such cases whether those persons searched have a reasonable expectation of privacy in the affairs or possessions intruded upon. See *Savva*, 159 Vt. at 87-88, 616 A.2d at 781 (recognizing separate and higher expectation of privacy for containers used to transport personal possessions than for objects exposed to plain view within automobile's interior); *Blow*, 157 Vt. at 517-19, 602 A.2d at 555-56 (recognizing reasonable privacy interest in being free from warrantless electronic participant monitoring in home); *State v. Brooks*, 157 Vt. 490, 493, 601 A.2d 963, 964 (1991) (refusing to recognize reasonable privacy interest in being free from warrantless electronic participant monitoring in parking lot open to public); *Kirchoff*, 156 Vt. at 6-7, 10, 587 A.2d at 992, 994 (recognizing reasonable expectation of privacy in posted open fields). Indeed, in *Kirchoff*, we found little textual significance in the word "possessions" in Article 11, and instead emphasized that our task was not to honor mere words but to discover and protect the core value of privacy embraced by Article 11. 156 Vt. at 4-6, 587 A.2d at 991-92; see *Savva*, 159 Vt. at 85, 616 A.2d at 779.

Nor is *State v. Wood*, 148 Vt. 479, 536 A.2d 902 (1987), upon which the dissent relies so heavily, inconsistent with our decision today. In *Wood*, a warrantless search was challenged by a defendant residing temporarily at a summer camp at the time police entered the camp and seized documents and other evidence related to a robbery. The trial court ruled that the defendant had no standing to challenge the search because he had no expectation of privacy in the camp grounds. This Court reversed and remanded the case for further proceedings, holding that the defendant had standing to challenge the search under the Vermont Constitution. *Id.* at 480, 536 A.2d at 903. After a

long discussion, we refused to adopt *Rakas v. Illinois*, 439 U.S. 128 (1978), in which the United States Supreme Court merged the collateral standing issue with the underlying substantive challenge to the search. See *Wood*, 148 Vt. at 484-85, 536 A.2d at 905-06; *Rakas*, 439 U.S. at 139-40. We rejected *Rakas* because, contrary to "the central purpose of Article Eleven," *Rakas* focused "the federal test away from judicial review of a challenged search" and curtailed "the scope of the protected right to be free from unlawful governmental conduct." *Wood*, 148 Vt. at 487, 536 A.2d at 907. We held that "a defendant need only assert a possessory, proprietary or participatory interest in the item seized or the area searched to establish standing to assert an Article Eleven challenge." *Id.* at 489, 536 A.2d at 908.

Stripped of its suggestion of standing,[5] the dissent's principal argument is nothing more than the discredited abandonment theory rejected by even the *Greenwood* majority. See *United States v. Hedrick*, 922 F.2d 396, 398 (7th Cir. 1991) (majority in *Greenwood* chose not to rely on principles of abandonment); 1 W. LaFave, *supra*, § 2.6(c), at 595 (*Greenwood* "should not be read as an endorsement of the broad and unsound concept that one's garbage is abandoned property and thus is always without Fourth Amendment protection"). Unlike the defendants in *Wood* and *Kerr*, however, defendant here is not claiming that he never possessed or owned the searched items. If we assume, as we hypothesized in *Kerr*, that defendant had a possessory or ownership interest in the searched items, then the question is not whether defendant abandoned the property in the sense of the law of personal property, but rather whether he abandoned the reasonable expectation of privacy he had in the property. 143 Vt. at 608-09, 470 A.2d at 676. This is precisely the question we address in this opinion.

---

[5] The dissent asserts that we should be asking whether there is a search covered under Article 11, not whether a covered search must be pre-authorized by a warrant. The dissent is impliedly arguing that we have overlooked a review of defendant's standing to raise the protection of Article 11, an issue that was not contested before either the trial court or this Court. Defendant's alleged lack of standing flies in the face of our holding in *Wood* and can only be based on the ground that defendant abandoned his trash when he placed it outside for pickup, an argument we reject in our discussion in the text. See *supra* and *infra* at 120-21, 680 A.2d at 96-97. If we were to employ *Wood* to make it more difficult for persons to challenge police intrusions into their private affairs, we would reach precisely the *opposit* result intended by *Wood*, which sought to broaden the ability of defendants to challenge police searches merely by asserting a privacy interest. See *State v. Wood*, 148 Vt. 479, 490, 536 A.2d 902, 908 (1987) (test adopted here ensures that defendant with protected interest may challenge search intruding on that interest; "preliminary inquiry into the defendant's standing looks no further than to determine whether the protected interest exists").

In addition to the abandonment theory, the State relies principally on the following brief rationale espoused by the *Greenwood* majority in holding that the Fourth Amendment does not constrain police from warrantless searches of curbside garbage:

> Here, we conclude that respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection. It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public. See [*People v. Krivda*, 486 P.2d 1262, 1269 (Cal. 1971)]. Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage "in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it," *United States v. Reicherter*, 647 F.2d 397, 399 (CA3 1981), respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded.

> Furthermore, as we have held, the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public. Hence, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, [389 U.S. 347, 351 (1967)].

*Greenwood*, 486 U.S. at 40-41 (footnotes omitted).

We decline, as have the California, Hawaii, New Jersey, and Washington state supreme courts, to follow this abbreviated analysis. See *People v. Krivda*, 486 P.2d 1262, 1268-69 (Cal. 1971) (disallowing warrantless search of curbside trash), *vacated and remanded on other grounds by* 409 U.S. 33, 35 (1972); *Tanaka*, 701 P.2d at 1276-77 (accord); *Hempele*, 576 A.2d at 804-07 (accord); *State v. Boland*, 800 P.2d 1112, 1117 (Wash. 1990) (accord). Broken down into its component parts, the *Greenwood* analysis states that there is no objectively reasonable expectation of privacy in the contents of opaque garbage bags placed at curbside for collection because (1) animals, scavengers and snoops might get at them; (2) the bags are relinquished to third

parties who may do as they please with them; and (3) police cannot be expected to ignore that which is exposed to the public.

The primary rationale relied on by the Court is the first one — because dogs, raccoons, children, scavengers, and snoops may get into curbside trash bags, people have no reasonable expectation of privacy in the contents of the bags, and therefore the government is free to search them without reason or warrant. We do not find this rationale persuasive. What a person "seeks to preserve as private, *even in an area accessible to the public*, may be constitutionally protected." *Katz v. United States*, 389 U.S. 347, 351-52 (1967) (emphasis added). The fact that leaving garbage for collection may entail privacy risks "hardly means that government is constitutionally unconstrained in adding to those risks." Amsterdam, *supra*, at 406. One may accept the possibility that one's garbage is susceptible to invasion by raccoons or other scavengers, and yet at the same time reasonably expect that the government will not systematically examine one's trash bags in the hopes of finding evidence of criminal conduct. See *Hempele*, 576 A.2d at 805 (there is constitutionally significant difference between assuming risk that scavenger or trash collector will search trash bags for objects of interest and assuming risk that police officer will scrutinize contents of garbage for incriminating materials); *State v. Stanton*, 490 P.2d 1274, 1279 (Or. Ct. App. 1971) (person may not expect privacy in backyard against children at play or parents looking for tardy children, yet at same time be entitled to expect privacy against police dragnet search of neighborhood backyards), *overruled in part on unrelated grounds by State v. Walle*, 630 P.2d 377 (Or. Ct. App. 1981); *Boland*, 800 P.2d at 1116 (while defendants may expect that children, scavengers, or snoops will sift through their garbage, average persons would find it reasonable to believe that they have privacy interest in being protected from warrantless governmental intrusion into their refuse); *State v. Stevens*, 367 N.W.2d 788, 800 (Wis. 1985) ("[T]he fact that non-state instrumentalities, even the elements, may act free of constitutional restraints does not confer on the state any rights it would not otherwise possess.").

Thus, the mere possibility that unwelcome animals or persons might rummage through one's garbage bags does not negate the expectation of privacy in the contents of those bags any more than the possibility of a burglary or break-in negates an expectation of privacy in one's home or car, or the possibility that an operator or party-line caller will listen in on a telephone conversation negates an expectation

of privacy in the contents of the conversation, or the possibility that a cleaning person or house guest will exceed the scope of a visit negates an expectation of privacy in a hotel room or home. See *Greenwood*, 486 U.S. at 54 (Brennan, J., dissenting); see also *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987) (government employee has reasonable expectation of privacy in office, even though "it is the nature of government offices that others — such as fellow employees, supervisors, consensual visitors, and the general public — may have frequent access to an individual's office"). Nor should citizens be required to accept greater police intrusion into their private affairs because of the increased frequency of people scavenging through garbage in difficult economic times. See *Kirchoff*, 156 Vt. at 12, 587 A.2d at 995-96 (constitutional privacy interest does not depend on vagaries of temporary social patterns); *DeFusco*, 620 A.2d at 758 (Katz, J., dissenting) (garbage-pickers should not "dictate how we as a society choose to live and what values we choose to protect").

The Supreme Court's second rationale — that garbage is turned over to third-party trash collectors who may do with it as they please — is even less persuasive than the first rationale. As Justice Brennan pointed out in his dissent, "the voluntary relinquishment of possession or control over an effect does not necessarily amount to a relinquishment of a privacy expectation in it"; otherwise, "a letter or package would lose all Fourth Amendment protection when placed in a mailbox or other depository with the 'express purpose' of entrusting it to the postal officer or a private carrier." *Greenwood*, 486 U.S. at 55 (Brennan, J., dissenting). In addition, as the New Jersey Supreme Court noted, the third-party rationale is predicated on three assumptions: (1) that garbage collectors have the right to look through closed garbage bags; (2) that garbage collectors have sufficient authority over the bags to consent to a police search; and (3) that because garbage collectors can consent to a search, the police need neither a warrant nor consent to search the garbage themselves. *Hempele*, 576 A.2d at 805. We agree with the New Jersey Supreme Court's assessment that the first assumption is debatable, the second is dubious, and the third is disturbing. *Id.* In an analogous situation, a landlord who has the right to enter a tenant's house to view waste does not have the authority to consent to a police search of the premises. *Chapman v. United States*, 365 U.S. 610, 616-17 (1961); see *Stoner v. California*, 376 U.S. 483, 489 (1964) (implicit consent to janitorial personnel to enter motel room does not amount to consent to police search of room). Apart from *Greenwood*, the Supreme Court

has never held that an intent to transfer an object or conversation to a third party renders any expectations of privacy unreasonable simply because the third party could then transfer the object to police. *Hedrick*, 922 F.2d at 400.

Placing opaque garbage bags at curbside for collection and disposal is not comparable to knowingly and voluntarily communicating information or selling contraband to a third party who turns out to be a police informer or agent. See *Zaccaro*, 154 Vt. at 91, 574 A.2d at 1261 ("Article 11 does not protect one who, by opening up his or her home to those who wish to take part in illegal activity, exposes such activity to undercover police officers."); cf. *Brooks*, 157 Vt. at 493, 601 A.2d at 964 (Article 11 allows warrantless electronic monitoring of face-to-face conversation between suspect and police informant in public place). Here, defendant did not expose the contents of his garbage to anyone, including the garbage collector. Note, *The Supreme Court — Leading Cases*, 102 Harv. L. Rev. 143, 196 (1988) ("[E]xposure of concealed garbage is neither required nor anticipated in the case of garbage collection."). Thus, there was no voluntary consent to search that served to waive defendant's constitutional right to be free from governmental intrusion into his private affairs.

The Supreme Court's third rationale — that police cannot be expected to avert their eyes from evidence exposed to the public — appears to be a misguided attempt to bootstrap the plain view doctrine into its analysis. In cases where animals or scavengers actually rummage through a person's trash bags and expose the contents of those bags to public view, the police, to be sure, need not avert their eyes. But this principle is not relevant here. The issue is not whether police must avert their eyes, but rather whether they can sift through curbside garbage bags whose contents are concealed from the public eye.

For the above reasons, we decline to follow the *Greenwood* majority's decision allowing warrantless trash searches. We recognize, however, that the privacy interest in one's trash is not equivalent, for example, to the privacy interest in one's home. Accordingly, the seizure and search of trash need not be bounded by the same limitations that are applicable to the search of a dwelling. 1 W. LaFave, *supra*, § 2.6(c), at 603-04. Although people have an interest in keeping the contents of their garbage bags private, they have no privacy or possessory interest in keeping the bags in any particular location. As long as the contents remain private, it does not matter whether the trash bags are at the landfill or the police station.

Ordinarily, the *seizure* of trash bags would be permitted without a warrant given the exigency of the situation. *Hempele*, 576 A.2d at 810-11. Once the police have seized the bags, however, they cannot search them before obtaining a warrant based on probable cause. Cf. *Savva*, 159 Vt. at 90, 616 A.2d at 782 (warrantless search of container found in car was not supported by exigent circumstances because less intrusive option — seizure of container pending issuance of warrant — was available).

We acknowledge that today's decision limits, to some extent, tactics that police may use in investigating reports of criminal activity. But improving the efficiency of law enforcement cannot come at the expense of the protection provided by Article 11 against unconstrained governmental intrusion into our private lives. See *id.* at 92, 616 A.2d at 783 ("Article 11 is the balance struck between liberty for the individual (privacy and a sense of security) and the convenience of unchecked crime detection."). We will not countenance under Article 11 a society in which authorities require citizens to dispose of their personal effects in a manner that is then deemed unworthy of protection from arbitrary governmental monitoring without judicial oversight. See *Greenwood*, 486 U.S. at 55-56 (Brennan, J., dissenting).

 In this case, defendant exposed to public view only the exterior of opaque trash bags, and in doing so, he sought to dispose of his personal possessions in the accepted manner that normally would result in commingling them inextricably with the trash of others. Nevertheless, without probable cause or judicial oversight, police searched through defendant's trash, as well as the trash of other apartment dwellers who had the misfortune of placing their garbage bags alongside those of someone suspected of having committed a crime. Such unconstrained governmental intrusion into people's private lives is inconsistent with Article 11 and a free and open society. Because the warrantless search of defendant's trash violated Article 11, the evidence obtained from that search, which was used to obtain a warrant to search defendant's home, must be suppressed and expunged from the affidavit supporting the search warrant.

 In the dissent's view, our decision is an unprincipled, result-oriented opinion that forgoes textual and historical analysis for the purpose of evading the result reached by the majority of the United States Supreme Court in *Greenwood*. This view has no basis in law or fact. We are a sovereign state, and this Court is entitled to take issue with any constitutional decision of the United States Supreme Court,

regardless of whether our constitution provides the same or a different text. Like us, the Supreme Court hands down its decision on paper, not stone tablets. Because the Supreme Court's ebbs and flows in the area of criminal constitutional law do not dictate our interpretation of Article 11, see *Savva*, 159 Vt. at 84, 616 A.2d at 779, we have no reason to "evade" that Court's rulings. Today's decision rests on our belief that warrantless searches of trash bags set out for pickup and disposal offend the core value of privacy embraced by Article 11. That belief is informed by the language of Article 11, as interpreted in our case law, by the case law of other jurisdictions interpreting similar constitutional provisions, and by economic and sociological considerations that result, in part, from our experience as judges and human beings. The dissent chides us for devoting too much analysis to debunking the rationales relied on by the *Greenwood* majority and for quoting too extensively from Justice Brennan's dissent in *Greenwood*, but whenever we have decided to take a different path from that of the Supreme Court, our opinions have often rested largely on an analysis of the rejected federal law. See, e.g., *State v. Oakes*, 157 Vt. 171, 175-83, 598 A.2d 119, 122-26 (1991) (analyzing and rejecting Supreme Court's good faith exception to exclusionary rule as set forth in *United States v. Leon*, 468 U.S. 897 (1984)); *Kirchoff*, 156 Vt. at 8-10, 587 A.2d at 993-94 (analyzing and rejecting Supreme Court's "open fields" test as set forth in *Oliver v. United States*, 466 U.S. 170 (1984)); *Wood*, 148 Vt. at 483-87, 536 A.2d at 904-07 (analyzing and rejecting search-and-seizure standing test as set forth in *Rakas*).

Apparently, the dissent would have us analyze some unidentified historical and legislative materials to support our holding. We have already recognized that the Vermont Constitution was adopted with little recorded debate, that Article 11 was not a provision unique to Vermont but rather was copied practically verbatim from other jurisdictions, and that the paucity of the historical record requires us "to look elsewhere when determining the breadth of those individual rights the Vermont Constitution was drafted to protect." *Kirchoff*, 156 Vt. at 5, 587 A.2d at 991. In short, we do not need a unique state source to justify our difference with the most recent majority opinion of the United States Supreme Court, and yet it behooves us to consider the reasoning of all courts that have addressed similar issues and fact patterns. Points made by Justice Brennan, or other judges or courts deciding this issue, inform our analysis and aid in our resolution of the question at hand.

█ The dissent contends that we have failed to follow this Court's admonition in *State v. Jewett*, 146 Vt. 221, 224-25, 500 A.2d 233, 235-36 (1985), to refrain from issuing result-oriented opinions based on state constitutional law. The discussion in *Jewett* referred to a law review article in which Justice Pollock of the New Jersey Supreme Court argued that state courts had to develop a rationale to explain when they would accept cases and rely on their own constitutions. See Pollock, *State Constitutions as Separate Sources of Fundamental Rights*, 35 Rutgers L. Rev. 707, 717 (1983). According to Justice Pollock, as noted in *Jewett*, "State courts should not look to their constitutions *only* when they wish to reach a result different from the United States Supreme Court." *Id.* (emphasis added). Thus, in Justice Pollock's view, state courts of last resort should accept appeals on predetermined criteria and look to their own constitutions regardless of whether they are inclined to reach a result the same as, or different from, that reached by the Supreme Court. Neither *Jewett* nor Justice Pollock suggests that this Court or any state court should refrain from following a different path from that taken by the United States Supreme Court unless the court can rely on unique state sources — historical, legislative or otherwise. Indeed, to the contrary, in *Jewett* we stated that when the state constitutional issue is squarely raised on appeal, we will consider all types of argument, including historical, textual, doctrinal, prudential, structural, and ethical arguments. 146 Vt. at 225, 227, 500 A.2d at 236, 237. In this case, we address whether warrantless garbage searches violate Article 11 of the Vermont Constitution because the issue was properly raised, briefed, and presented to us for argument. Our decision is not result-oriented simply because it reaches a result different from the Supreme Court, any more than it would be result-oriented had we reached the same result as the Supreme Court.

### III.

█ The State contends that even if the search of defendant's trash was illegal and the evidence found in the trash is expunged from the supporting affidavit, the affidavit still established probable cause for issuance of the warrant to search defendant's home. We recognize that a

> search warrant is not invalid merely because it is supported
> in part by an affidavit containing unlawfully obtained infor-
> mation. Where the affidavit includes allegations based on

illegally obtained evidence as well as independent and lawfully obtained information, a valid search warrant may issue if the lawfully obtained information, considered by itself, is sufficient to establish probable cause to issue the warrant.

*State v. Moran*, 141 Vt. 10, 16, 444 A.2d 879, 882 (1982) (citations omitted). Further, while it is not normally the function of appellate review to make a de novo determination of probable cause, *State v. Maguire*, 146 Vt. 49, 53, 498 A.2d 1028, 1030 (1985), in cases where we have ruled that some of the evidence presented in the supporting affidavit must be expunged, we may determine whether the remaining information contained in the excised affidavit established probable cause for issuance of the warrant. See *Moran*, 141 Vt. at 16, 444 A.2d at 882.

Probable cause to search exists when the information set forth in the affidavit is such that a judicial officer would reasonably conclude that a crime had been committed and that evidence of the crime will be found in the place to be searched. *State v. Ballou*, 148 Vt. 427, 433-34, 535 A.2d 1280, 1284 (1987); see *State v. Towne*, 158 Vt. 607, 614, 615 A.2d 484, 488 (1992) (rejecting "more-likely-than-not" standard for probable cause to search; stating that probable cause more closely approximates "reasonable" cause). If any of the information comes from a confidential informant, V.R.Cr.P. 41(c) requires that the information meet the two-prong test set forth in the United States Supreme Court's decisions in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969). Under that test, there must be "a substantial basis for believing the source of the hearsay to be credible and for believing that there is factual basis for the information furnished." V.R.Cr.P. 41(c).

Here, the excised affidavit stated the following information: (1) the confidential informant told police that defendant was selling eighth- and quarter-ounce bags of marijuana from his apartment and from the parking lot of a local grocery store; (2) the informant stated that he was present during some of the drug transactions and that he was familiar with marijuana because he had smoked it before; (3) the informant's statement that defendant sold marijuana in a certain grocery store parking lot was consistent with a different police officer's observations of suspicious activity by defendant and another man one night five months earlier in the same parking lot; and (4) an unidentified neighbor recently informed police that many different people had visited defendant's apartment during the last few weeks.

Although the factual-basis prong is minimally satisfied by the informant's statement that he or she was present during some of the alleged drug transactions, the affidavit fails to satisfy the second prong, which requires the facts to show that "either the informant is inherently credible or that the information from the informant is reliable on this occasion." *Ballou,* 148 Vt. at 434, 535 A.2d at 1284. The credibility of an unidentified informant is generally supported by a showing that the informant has provided correct information in the past, while the reliability of the information on a particular occasion is supported by a showing that the informant's tip was against penal interest or that the information was corroborated by police to the point where it would be reasonable for them to rely on it as accurate. See 2 LaFave, *supra,* § 3.3(a), at 91-95.

■■■ The State argues that the information was reliable because (1) the confidential informant made statements against penal interest — that he had smoked marijuana and had been present during some drug transactions; (2) the police corroborated the informant's claim that defendant sold drugs in a certain grocery store parking lot; and (3) a second informant, the neighbor, provided information that tended to corroborate the first informant's claim that defendant was selling drugs from his apartment. None of these facts, either independently or together, satisfies the reliability prong of Rule 41. First, the informant's statements that he had smoked marijuana at some point in the past and that he had been present during drug transactions are hardly admissions against penal interest. Acknowledgments that merely create a suspicion of the informant's involvement in criminal activity, such as that the informant was present during a drug transaction, will not suffice as admissions against penal interest. *Id.* § 3.3(c), at 134-35. Moreover, admissions against penal interest imply that police could elect to use the statements to prosecute the informant; because one can be prosecuted only for possession or deliverance of marijuana, a statement of past use cannot, in and of itself, result in prosecution. Cf. *Ballou,* 148 Vt. at 435 n.3, 535 A.2d at 1284 n.3 (informants' statements that they had purchased drugs from defendant were admissions against penal interest that had some bearing, but not controlling weight, regarding informants' reliability).

Second, the officer's retrospective corroboration of the information was minimal and stale. The fact that defendant and another man had remained in the named grocery store parking lot for a few minutes one night five months earlier can hardly support a warrant to search defendant's apartment. This is true even considering the unidentified

neighbor's report that defendant had had many visitors at his apartment during the previous month. The affidavit failed to demonstrate the reliability of the neighbor's information, and even if it were reliable, the information provided by both informants does not establish probable cause that defendant was selling drugs from his apartment. Accordingly, the evidence seized during the search of defendant's apartment must be suppressed.

*Reversed and remanded.*

**Dooley, J.,** dissenting. There are many statements in the majority opinion with which I agree. I agree that Chapter I, Article 11 of the Vermont Constitution normally requires advance authority for covered searches by way of a warrant. I agree that expectations of privacy are not necessarily reduced by increasing governmental intrusion into people's lives. Most of all, I agree that our decision must be guided by the facts of this case.

Except for the necessity of keeping this case within the facts on which it is based, a point that strongly indicates the opposite result, as discussed below, these principles have little to do with this case. The question before us is whether there is a search covered by Article 11, not whether a covered search must be pre-authorized by a warrant. Indeed, I think it undeniable that the majority opinion ends search of trash as an investigative tool, because there will never be probable cause to search trash, and certainly not the trash of innocent neighbors who just happen to live in the same apartment building, without there being probable cause to search the home or other structure.[1]

Nor is this a case of "increasing governmental intrusion" into the lives of ordinary citizens. I have no doubt that examining people's waste has been an investigative tool of law enforcement throughout recorded history.

The Court's decision in this case tells us how the majority would have decided *California v. Greenwood*, 486 U.S. 35 (1988). It tells us

---

[1]The majority speaks on two sides of this issue, saying, on the one hand, that "the seizure and search of trash need not be bounded by the same limitations that are applicable to the search of a dwelling," and adding, on the other hand, that search of trash bags would require "a warrant based on probable cause." The latter statement makes the former one illusory.

If police must show probable cause and obtain a warrant, search of trash is no longer an investigatory tool. It is available only if the police can show that evidence of the crime is in the trash, which inevitably means they can also show that evidence is likely to remain in the house or structure from which the trash is taken.

virtually nothing about Article 11 and generally ignores our relevant precedents interpreting the Article, except in response to this dissent. After calling the *Greenwood* rationale "brief," the majority's analysis here is limited almost entirely to why the *Greenwood* rationale is wrong, relying mainly on quotes from Justice Brennan's dissent in *Greenwood*, as well those from Justices from other states, who, in majority or dissent, agree with the general philosophical principles articulated by the majority.

In staking out a leadership position in state constitutional adjudication, Justice Hayes, speaking for the Court in *State v. Jewett*, 146 Vt. 221, 225-27, 500 A.2d 233, 236-37 (1985), outlined the approaches available for interpretation of our constitutional provisions: (1) historical analysis; (2) textual analysis; (3) analysis of decisions of sister states with similar or identical provisions; and (4) analysis of economic or sociological materials. He cautioned, however, "[i]t would be a serious mistake for this Court to use its state constitution chiefly to evade the impact of the decisions of the United States Supreme Court. Our decisions must be principled, not result-oriented." *Id.* at 224, 500 A.2d at 235. The majority decision relies little on the appropriate methodology for constitutional adjudication and even less on our decisions construing Article 11. It is a restated *Greenwood* dissent.

Although our analysis of Article 11 has been limited, three decisions in which we have examined the Article require a result opposite that reached by the majority. The first is *State v. Wood*, 148 Vt. 479, 536 A.2d 902 (1987), in which we were required to determine what interests were sufficient to confer standing on a criminal defendant to raise Article 11 rights. Relying primarily on the text of Article 11, we held:

> Article Eleven itself establishes the scope of the protected right, and defines who may invoke its protection. The right of the people "to hold themselves, their houses, papers, and possessions, free from search or seizure," defines a right dependent on a possessory interest, with equal recognition accorded to the item seized and the area intruded upon. By delineating the right as a possessory interest, Article Eleven premises the protected right upon an objectively defined relationship between a person and the item seized or place searched, as opposed to a subjective evaluation of the legitimacy of the person's expectation of privacy in the area searched.

*Id.* at 489, 536 A.2d at 908.

The second is *State v. Kirchoff*, 156 Vt. 1, 587 A.2d 988 (1991), in which we held that Article 11 applies to "open fields," as long as the possessor of those fields establishes indicia of privacy "such as fences, barriers or 'no trespassing' signs [that] reasonably indicate that strangers are not welcome on the land." *Id.* at 10, 587 A.2d at 994. In reaching this decision, we relied upon the *Wood* holding that Article 11 "'defines a right dependent on a possessory interest,'" *id.* at 8, 587 A.2d at 993 (quoting *Wood*, 148 Vt. at 489, 536 A.2d at 908), and that the landowner had a possessory interest in the land despite its development state.[2] We also followed closely the standard for criminal trespass, showing that the landowner's privacy interest was so accepted that the conduct of the police violated the criminal law. See *id.* at 10, 587 A.2d at 994.

The third decision is *State v. Brooks*, 157 Vt. 490, 601 A.2d 963 (1991), along with its companion decision *State v. Blow*, 157 Vt. 513, 602 A.2d 552 (1991). In *Blow*, we held that participant electronic monitoring of a conversation in the home, transmitted from the wired informant to police in a nearby vehicle, violated Article 11 unless authorized by a warrant because of the special expectations of privacy in the home and the fact that the speaker-homeowner had not knowingly exposed the conversation to the outside world. In *Brooks*, we considered the same participant electronic monitoring where the wired informant and the defendant were in two adjacent vehicles in a parking lot. We held that such monitoring was not regulated by Article 11: "[W]e find that defendant, regardless of what he actually expected, did not enjoy a reasonable expectation of privacy in a public parking lot. In that setting, conversations are subject to the eyes and ears of passersby." 157 Vt. at 493, 601 A.2d at 964.

The majority's response, as I understand it, is that the most critical of these precedents is about standing, and the State has not claimed that defendant in this case lacks standing. This response ignores the point of the *Wood* decision, which was to make the concept of standing consistent with the right protected by Article 11. Thus, the analysis is about "the scope of the protected right" and the holding is that the Article delineates *"the right* as a possessory interest." *Wood*, 148 Vt.

---

[2] I disagree with the majority's statement that *Kirchoff* found "little textual significance" to the use of the word "possessions" in Article 11. The decision enforces both the wording of Article 11 and the underlying purpose "to give meaning to the text in light of contemporary experience." 156 Vt. at 6, 587 A.2d at 992. Thus, we found the Article protects possessory interests in land. *Id.* at 8, 587 A.2d at 993.

at 489, 536 A.2d at 908 (emphasis added). Although the analysis appears in a standing case, it is squarely against the majority's reasoning in this case.

Defendant lived in an apartment building. He and the other tenants in the building put out their trash in plastic bags at curbside for Monday pick-up. Five or six bags were placed outside a fence which was located six feet from the apartment building.

I think it is clear from our precedents that Article 11 does not extend to the trash bags put out on the curb by defendant and other tenants. By putting them in a public place, defendant no longer had a possessory interest in the trash and had no protected interest in the area from which it was taken. The trash fell outside the protection of Article 11, as we defined it in *Wood* and *Kirchoff*, irrespective of the expectation of privacy of defendant or Vermont society as a whole.[3] Like the conversations which were subject to the eyes and ears of passersby in *Brooks*, the trash bags were subject to the hands and eyes of any member of the public who, without legal restriction, opened them or took them.[4] On the facts of this case, there is no violation of Article 11.

Beyond its attempt to distinguish *Wood*, the majority appears to have two answers to this straightforward analysis. First, relying on a law review article for the proposition that "[m]ost people today have little choice but to place their garbage at curbside for collection by public or private trash haulers," the majority asserts that citizens cannot avoid subjecting their trash to police scrutiny unless Article 11 restricts that scrutiny. I am not surprised that the proposition comes from an article published in New York, one of the most population-dense of American states, but find it incredible that the majority would apply it to Vermont, the most rural of states, where most residences do not have curbs at all. Although modern solid waste management may have taken some of the cultural charm out of the

---

[3] The majority calls this "nothing more than the discredited abandonment argument rejected by even the *Greenwood* majority." This comment reinforces my view that the Court is dissenting to *Greenwood* rather than analyzing the issues and applying an independent jurisprudence. The "abandonment argument" was a federal argument relating to the federal definition of the protected interest. Since our definition of the protected interest is different, or was until this decision was issued, the argument, whatever it was, is generally irrelevant to this decision. In any event, as noted in footnote 5, *infra*, I do not agree that because garbage is "abandoned" it is beyond the protection of Article 11 in all instances.

[4] The majority puts great weight on the fact that the trash was placed in opaque bags. Given our interpretation of Article 11, I consider this fact irrelevant.

weekly trip to the "dump" in favor of large regional landfills and transfer stations, defendant can still exercise the time-honored tradition of self-disposal, ensuring his garbage is mixed in anonymously with that of many of his fellow citizens. Moreover, he could have chosen a living arrangement, whether single-family or an apartment, that did not leave his garbage outside the curtilage waiting for pick-up.[5]

The second answer is that defendant, although exposing the trash to public scrutiny, retains a reasonable expectation of privacy against police scrutiny. This is the kind of selective expectation we rejected in *Brooks*. As Chief Justice Peters of the Connecticut Supreme Court noted:

> A person's reasonable expectations as to a particular object cannot be compartmentalized so as to restrain the police from acting as others in society are permitted or suffered to act. . . . A person either has an objectively reasonable expectation of privacy or does not; what is objectively reasonable cannot, logically, depend on the source of the intrusion on his or her privacy.

*State v. DeFusco*, 620 A.2d 746, 752-53 (Conn. 1993). The logical extension of the majority's argument is that all forms of police surveillance are prohibited because in a free and open society we do not want that very freedom to create police opportunities to snoop. We noted in *Brooks* that use of informants is "one of the basic characteristics of a totalitarian state," but "has long been accepted as a necessary compromise between the ideals of a perfectly private society and a perfectly safe one." 157 Vt. at 494, 601 A.2d at 965. Article 11 does not cover every instance where Vermont society might believe that individuals should have privacy rights. Whether that is a "necessary compromise," as *Brooks* found, or the limitation of a constitutional provision that restricts searches and seizures rather than protecting broad privacy rights, we must acknowledge that we cannot stretch constitutional language to regulate every law enforcement tool.

---

[5] I would consider this a different case if the police trespassed on the curtilage in order to obtain the garbage. On this point, I agree with much of the analysis of the Alaska Supreme Court in *Smith v. State*, 510 P.2d 793, 797-98 (Alaska), *cert. denied*, 414 U.S. 1086 (1973), a pre-*Greenwood* decision that held that a police examination of trash in circumstances similar to those present here was not regulated by the Alaska Constitution.

136

I strongly agree with the creation of an independent state constitutional jurisprudence that keeps essential decisions about protected liberties as much as possible within Vermont. In *State v. Wood*, we developed an independent jurisprudence on the scope of Article 11, in large part to avoid the effect of a Supreme Court decision, *Rakas v. Illinois*, 439 U.S. 128 (1978), with which we disagreed. With no acknowledgement of the holding in *Wood*, except in response to this dissent, the majority has now developed a new concept of the Article, directly contrary to that in *Wood*, again to avoid the effect of a Supreme Court decision. The only consistency, as the majority appears to admit, is that both *Wood* and this case are about making it easier "for persons to challenge police intrusions into their private affairs."

We cannot build a principled and coherent construction of Article 11 out of the majority opinion in every United States Supreme Court Fourth Amendment decision with which we agree, combined with the dissent in every such decision with which we disagree. As Justice Hayes cautioned in *Jewett*, such a course is a "serious mistake" that inevitably leaves our jurisprudence fragmented and result-oriented. By abandoning the decisions that form the cornerstones for our Article 11 jurisprudence in order to war with a United States Supreme Court decision it finds distasteful, the majority, in my judgment, is making exactly the mistake Justice Hayes warned against.

I dissent. I am authorized to state that the Chief Justice joins in this dissent.